758 So.2d 1 (1999)
Corey MAPLES
v.
STATE.
CR-97-0548.
Court of Criminal Appeals of Alabama.
March 26, 1999.
Rehearing Denied May 28, 1999.
*14 W. Clint Brown, Jr., Decatur; Denise Hill, Decatur; Bryan White, Decatur; and James Ralph Mason, Jr., Decatur, for appellant.
Bill Pryor, atty. gen., and Kathryn D. Anderson, asst. atty. gen., for appellee.
BASCHAB, Judge.
The appellant, Corey Maples, was convicted of two counts of capital murder for 1) the murders of Stacy Alan Terry and Barry Dewayne Robinson II pursuant to one scheme or course of conduct, § 13A-5-40(a)(10), Ala.Code 1975, and 2) the murder of Stacy Alan Terry during the course of committing a robbery, § 13A-5-40(a)(2), Ala.Code 1975. By a vote of 10-2, the jury recommended that the appellant be sentenced to death. The trial court accepted the jury's recommendation and sentenced the appellant to death.
Because the appellant does not specifically challenge the sufficiency of the evidence to support his convictions, a lengthy recitation of the evidence presented is unnecessary. However, we have reviewed all of the evidence and find that it is sufficient to support the appellant's convictions. The following summary of the relevant facts, as prepared by the trial court, may be helpful to an understanding of this case:
"At some time in the late evening hours of Friday, July 7, 1995, or the early morning hours of Saturday, July 8, 1995, Stacy Alan Terry, Barry Dewayne Robinson II, and the Defendant, Corey *15 Ross Maples, arrived at the residence of the Defendant on Mud Tavern Road in Morgan County. All three of the young men were acquaintances. Mr. Terry, whose nickname was Twinky, and the Defendant had spent the evening of July 7 drinking, playing pool, and `riding around' in Mr. Terry's 1995 Camaro. The Defendant and Mr. Terry had attended high school together until the Defendant dropped out his senior year. As evidenced by the testimony of family and friends, the two young men had spent a considerable amount of time together during the week preceding these events.
"Mr. Robinson was new to the area, but had known Mr. Terry and the Defendant for several months. Mr. Robinson asked Mr. Terry for a ride home from the pool hall where all three young men were playing pool.
"Once the three young men arrived at the home of the Defendant, Corey Maples, he left the car and went into the mobile home. The defendant picked up a .22 caliber rifle and walked back outside to the car where Mr. Terry and Mr. Robinson sat getting ready to leave. The Defendant walked to the driver's side of the car and shot Mr. Terry twice in the head and then shot Mr. Robinson twice in the head.
"At some time around 1:00 a.m. on July 8, 1995, the Defendant's half-brother, Daniel Maples, and his friend, Matt Shell, arrived at the residence on Mud Tavern Road and found the body of Stacy Terry lying in the driveway close to the trailer where the Defendant and his half-brother lived with their father and the Defendant's stepmother.
"At some time around 9:00 p.m. on July 8, 1995, the Decatur police received a report of a body found in a creek commonly referred to as Mud Tavern Creek, one mile down the road from the Defendant's residence. The body was identified as that of Barry Robinson II.
"During the ensuing investigation of the two young men's murders, officers of the Morgan County Sheriffs Department obtained information that implicated Corey Ross Maples in the killings of Mr. Terry and Mr. Robinson. The officers began to look for the Defendant and Mr. Terry's missing Camaro with the personalized tag bearing the word `TWINK.'
"In the late evening of August 1, 1995, the Nashville Metropolitan Police Department received a telephone call from an individual who had spotted the Defendant at the Best Rest Motel off I-10 in Nashville. The individual had seen a picture of the Defendant and heard a description of the car from a local television station. Members of the Nashville Police Department apprehended the Defendant at the motel. The Defendant was then transported to the Nashville Metropolitan Police Department where he was held until members of the Morgan County Sheriffs Department arrived. During the early morning hours of August 2, 1995, the Defendant gave Investigators Howard Battles and Byron Whitten of the Morgan County Sheriffs office a statement of confession to the murders.
"Mr. Terry and Mr. Robinson died as a result of gunshot wounds to the head. Both young men were shot twice in the head. The medical examiner determined that each man's death was instantaneous to the shots to the head. The wounds were consistent with an execution-type slaying. The evidence proved beyond a reasonable doubt that the Defendant shot both men. He was armed with a .22 caliber rifle which belonged to his father.
"Evidence, both circumstantial and direct, overwhelmingly supported the foregoing finding: Count I of the indictment charged the Defendant, Corey Maples, in the killing of two people in a single transaction or occurrence as described in Ala.Code [1975,] § 13A-5-40[(a)](10)(1994 *16 repl. vol.). Count II of the indictment charged the Defendant, Corey Maples, with the murder of Stacy Terry during the course of a robbery as described in Ala.Code [1975,] § 13A-5-40[(a)](2)(1994 repl. vol.). The jury returned a verdict of guilty on both counts of capital murder after five plus days of testimony. The Defendant was the sole participant in this brutal double murder of Stacy Alan Terry and Barry Dewayne Robinson II, as well as the murder of Stacy Alan Terry in the course of robbing Stacy Alan Terry of his 1995 Camaro automobile."
(C.R.554-56.) Additional facts are included, as necessary, throughout this opinion.
The appellant raises several issues on appeal that he did not first present to the trial court. The failure to object will not bar our review of an issue in a case involving the death penalty. However, it will weigh against any claim of prejudice. Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). Rule 45A, Ala. R.App. P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review... whenever such error has or probably has adversely affected the substantial right of the appellant."
"[This] plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)).

I.
The appellant's first argument is that the trial court erroneously denied him discovery of DNA-related evidence. Specifically, he contends that he was entitled to obtain discovery of each of the 12 items enumerated in Ex parte Perry, 586 So.2d 242, 255 (Ala.1991), but that the State provided only 2 of those items: 1) a copy of the report run by the laboratory and issued to the State and 2) chain-of-custody documents. He contends that the State should have produced the 10 other items because he allegedly specifically requested DNA evidence and because the denial of the discovery allegedly prevented him from effectively rebutting the State's inculpatory DNA evidence. Finally, citing Ex parte Hutcherson, 677 So.2d 1205 (Ala. 1996), he argues that such an error can never be harmless.
In Ex parte Perry, 586 So.2d 242 (Ala.1991), the Alabama Supreme Court addressed the admissibility of DNA evidence. After setting forth a three-pronged test for determining the admissibility of DNA evidence, that court held:
"DNA evidence is discoverable, at least by the defendant. The defendant's fair trial and due process rights, Art. I, § 6, Alabama Constitution, as well as Rule 16.1, A.R.Crim.P., clearly require that the prosecution allow the defendant access to the DNA evidence. See also [State v.] Schwartz, [447 N.W.2d 422] 427-28 [(Minn.1989)]. Discovery by the State of DNA evidence in the possession of the defendant should be conducted in accordance with Rule 16.2, A.R.Crim.P.
"To produce uniformly sufficient information to allow a proper, well-informed determination of the admissibility of DNA evidence and to produce uniformity in DNA evidentiary hearings, we further suggest the following guidelines, which we take substantially from [People v.] Castro, 144 Misc.2d [956] at 978-79, 545 N.Y.S.2d [985] at 999 [(Sup.Ct. 1989)]:
"1. The proponent of the DNA evidence, whether defense or prosecution, should give discovery to the adversary, which should include, upon request: (1) Copies of autorads, *17 with the opportunity to examine the originals. (2) Copies of laboratory books. (3) Copies of quality control tests run on material utilized. (4) Copies of reports by the testing laboratory issued to the proponent. (5) A written report by the testing laboratory setting forth the method used to declare a match or non-match, with actual size measurements, and mean or average size measurement, if applicable, together with standard deviation used. (6) A statement setting forth observed contaminants, the reasons therefor, and tests performed to determine the origin and the effects thereof. (7) If the sample is degraded, a statement setting forth the tests performed and the results thereof. (8) A statement setting forth any other observed defects or laboratory errors, the reasons therefor and the effects thereof. (9) Chain of custody documents. (10) A statement by the testing lab, setting forth the method used to calculate the allele frequency in the relevant population. (11) A copy of the data pool for each loci examined. (12) A certification by the testing lab that the same rule used to declare a match was used to determine the allele frequency in the population. (Note that the discovery provisions in (10), (11), and (12) specifically address evidence of DNA population frequency statistics.)"
586 So.2d at 255 (emphasis added). However, "`[t]here is no general constitutional right to discovery in criminal cases, and Brady did not create one.' Weatherford v. Bursey, 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977)." McMullin v. State, 442 So.2d 155, 157 (Ala.Cr.App. 1983). Therefore, as we explained in Moon v. State, 460 So.2d 287 (Ala.Cr.App. 1984), discovery requests should be specific.
"The third issue raised is whether or not the trial court committed error when it refused to grant appellant's request for production and disclosure. A portion of that request included the following:
"`2. (a) Any and all statements of any other person made in connection with the investigation of this case and which implicates the Defendant.
"`(b) Any and all notes, memoranda or reports relating to such statements.'
"Specifically, Moon claims it was error not to provide him with a copy of a statement made by Donald Bryant.... We further note, as did the State in brief, that there is no general constitutional right to discovery by a defendant in a criminal case. Bass v. State, 417 So.2d 582 (Ala.Crim.App.1982). Appellant's request for production was not specific; as this court has pointed out in the past, a motion for discovery should not be a mere `fishing expedition', Giddens v. State, 333 So.2d 615 (Ala.Crim. App.1976), and we find no error in the lower court's denial of appellant's request for production and disclosure."
460 So.2d at 290-91.
We have carefully reviewed the appellant's written discovery requests, and we find that the appellant did not specifically request the 12 items listed in Perry. In fact, his first pre-trial discovery motions did not even mention DNA evidence. Furthermore, when discussing DNA evidence and discovery at a pre-trial hearing, the appellant did not specifically request the 12 items listed in Perry. Therefore, because the appellant's pre-trial requests for discovery were not sufficiently specific, he has not shown that the trial court improperly denied his pre-trial discovery requests.
The only time the appellant specifically requested the 12 items listed in Perry was during a hearing on the admissibility *18 of the DNA evidence after the trial had begun. At that point, he objected to the admission of the DNA evidence because the prosecution had produced only 2 of the 12 items listed in Perry. Even assuming that the prosecution should have produced the additional evidence in discovery, reversal is not required. Although we view the failure to comply with Rule 16, Ala. R.Crim. P., "`with particular disfavor and condemnation,'" not every violation of Rule 16 requires the suppression of the undisclosed evidence or reversal. Pettway v. State, 607 So.2d 325, 330 (Ala.Cr.App. 1992) (citations omitted). "Instead, Rule 16.5 `gives a trial judge a number of options to consider in imposing sanctions on a party who has failed to comply with the court's discovery order.'" Pettway, 607 So.2d at 330 (quoting Clifton v. State, 545 So.2d 173, 178 (Ala.Cr.App.1988)). However, to obtain relief based on a discovery violation, the objecting party must make a specific and timely objection.
"Rule 16 does not exist in a vacuum; it is subject to the general principle that objections must be made in a timely fashion....
"A trial court should be informed of a party's failure to comply with discovery procedures as soon as the aggrieved party is aware of the non-compliance.... The requirement of a timely objection simply gives the trial court the opportunity to take corrective action where such action is warranted, see State v. Willis, 438 So.2d 605, 613 (La. App.1983), and is in keeping with standard trial procedure and evidentiary rules.
"... `To be timely, an objection must be interposed as soon as the ground for the objection becomes apparent.' Watson v. State, 439 So.2d 762, 769 (Ala.Cr. App.1983)."
Pettway, 607 So.2d at 331.
Approximately three months before the trial began, the prosecution produced the DNA evidence report it intended to use at trial. More than two months before the trial began, the trial court granted the appellant's request for funds for independent testing of the DNA evidence. Nevertheless, during that time, the appellant did not request discovery of any additional DNA evidence. Even assuming he could not have known what specific requests to make before then, he could have used his expert's assistance to make a more specific discovery request before the trial began. As a result, his only specific request for the items was untimely. Because the appellant's previous requests were not specific and because his only specific request was untimely, the trial court properly denied the appellant's mid-trial request for discovery of additional DNA evidence.
Finally, the appellant has not shown that he was prejudiced by the nondisclosure of the additional DNA evidence. "The moral culpability, or the willfulness, of the prosecutor is not a factor in deciding the constitutional issue involved here." McMullin, 442 So.2d at 157.
"In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held, that `the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' 373 U.S. at 87, 83 S.Ct. at 1196-97, 10 L.Ed.2d at 218. `"A fair analysis of the holding in Brady indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." United States v. Agurs, 427 U.S. 97, [104], 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976).' Parker v. State, 482 So.2d 1336 at 1340 (Ala.Cr.App.1985). Thus, where the prosecutor fails to disclose evidence, regardless of its admissibility or its trustworthiness, the crucial question is whether the non-disclosure might have affected the outcome of the trial. State v. Kimberly, 463 So.2d 1106, 1108 (Ala.Cr.App.1984), rev'd, Ex parte Kimberly, *19 463 So.2d 1109 (Ala.1984). `[T]he omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.' United States v. Agurs, supra, 427 U.S. at 112-13, 96 S.Ct. at 2401-02, 49 L.Ed.2d at 349. `"The principle of Mooney v. Holohan, [294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935),] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." Brady, 373 U.S. at 87, 83 S.Ct. at 1197.' State v. Kimberly, supra, at 1108-09. The materiality of non-disclosed evidence is determined under the following analysis: where the non-disclosed evidence was specifically requested, a new trial should be granted if the non-disclosure could have affected the trial's outcome and, where the request was merely for exculpatory material or no request was made, the conviction should be reversed if the non-disclosed evidence would create a reasonable doubt that did not otherwise exist. McMullin v. State, 442 So.2d 155, 157-8 (Ala.Cr.App. 1983)."
Robinson v. State, 528 So.2d 343, 345-46 (Ala.Cr.App.1986).
In this case, there was abundant evidence of the appellant's guilt aside from the DNA evidence. Pettway v. State, 607 So.2d 325 (Ala.Cr.App.1992); McLemore v. State, 562 So.2d 639 (Ala.Cr.App.1989). Cf. Dubose v. State, 662 So.2d 1189 (Ala. 1995) (holding that DNA evidence was "critical evidence" because there was no other evidence, such as a confession, eyewitness testimony, or physical evidence, to connect the defendant to the crime). In this case, other evidence, including the appellant's confession, witness testimony about the appellant's actions before and after the murders, and physical evidence linked the appellant to the murders. Several witnesses saw him with the victims on the night of the murder. Terry's body was found in the appellant's driveway, and the gun used to shoot the victims was found in his residence. On the morning after the murders, the appellant cashed a check written on Terry's bank account, and witnesses testified that the signature on the check was not Terry's. When he was subsequently arrested in Nashville, the appellant had possession of Terry's vehicle. Furthermore, defense counsel admitted during closing arguments that the appellant was guilty of two counts of intentional murder, but argued that he was not guilty of capital murder because he did not commit the murders as part of one scheme or course of conduct and because he did not have the intent to commit a robbery at the time of the murders. Therefore, even without the DNA evidence, there was no reasonable doubt as to the appellant's guilt.
Moreover, we also note that defense counsel thoroughly cross-examined the State's DNA expert about the methods he used. Additionally, the results of the defense's independent DNA analysis were consistent with those reached by the State's expert. In fact, the results were even more accurate than the State's because the independent laboratory used three more genetic markers than the State laboratory used. For these reasons, the appellant has not shown that he was prejudiced by the admission of the evidence.
Finally, the appellant appears to argue that, based on the Alabama Supreme Court's holding in Hutcherson, supra, the failure of the prosecution to produce DNA evidence in discovery can never constitute harmless error. In Hutcherson, that court held:
"After reviewing the DNA testimony given in this case, we agree with the Court of Criminal Appeals that the trial court erred in failing to conduct a hearing outside the presence of the jury on *20 the admissibility of the DNA evidence. We also agree that the State failed to comply with Perry, because there was insufficient testimony concerning the reliability of the test results. Specifically, the testimony from forensic scientist Elaine Scott failed to satisfy the third prong of the Perry test because she did not testify as to the quality controls used by the Mobile laboratory. Additionally, testimony from Roger Morrison failed to sufficiently meet the third prong, because he explained only one type of quality control procedure used and did not testify as to other quality control procedures used except to state generally that quality controls were used. However, we disagree with the Court of Criminal Appeals' application of the harmless error doctrine to the admission of DNA evidence.
"`Harmless error' is defined as `an error which is trivial or formal or merely academic and was not prejudicial to the substantial rights of the party assigning it and in no way affected the final outcome of the case.' Black's Law Dictionary 718 (6th ed.1990). In order to secure a reversal of a judgment, an appellant not only must show error, but also must demonstrate that the error resulted in a substantial injury. Rule 45, A.R.App.P. Overwhelming evidence of guilt does not render prejudicial error harmless under Rule 45. Ex parte Lowe, 514 So.2d 1049 (Ala.1987).
". . . .
"`"Before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."' Ex parte Greathouse, 624 So.2d 208 (Ala.1993), quoting Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1982[1967]).
"We hold that the admission of the DNA evidence was not harmless beyond reasonable doubt. The prejudicial impact of both DNA `matching' evidence and DNA population frequency statistics creates such a possibility for prejudicial impact upon the jury that the admission of DNA evidence without complying with Perry can never be harmless error. Perry sets out the predicate for properly admitting DNA evidence, and it must be followed in order to ensure the reliability and trustworthiness of the evidence. The prejudicial impact of scientific testimony, such as that relating to DNA, can unduly influence a jury; it must have a proper foundation before it is presented....
"Based on the State's failure to comply with the standard we set out in Perry regarding DNA evidence, we must reverse the judgment of the Court of Criminal Appeals and remand the cause for further proceedings consistent with this opinion."
677 So.2d at 1208-09. The appellant's reliance on Hutcherson is misplaced. In Hutcherson, the Alabama Supreme Court held that the admission of DNA evidence without complying with the three-pronged Perry standard is improper and can never be harmless error. It did not hold that an alleged failure to produce DNA-related evidence in discovery can never constitute harmless error. Therefore, the appellant's argument is without merit.
We do note that the items the appellant requested would have been discoverable if his request had been specific and timely. See Perry, supra; see also Turner v. State, 746 So.2d 355 (Ala.1998). Furthermore, we recognize that, as more methods of DNA testing are created, additional items and information will be subject to discovery. Therefore, we encourage prosecutors to be generous in responding to discovery requests regarding DNA evidence.
We further note that this problem could have been avoided if the hearing on the admissibility of the DNA evidence had been conducted before the trial began. However, we also recognize the financial concerns created by requiring experts to testify on two different occasions. Therefore, when feasible, we encourage trial *21 judges to conduct the admissibility hearings before the trial begins.

II.
The appellant's second argument is that, during the guilt-phase and penalty-phase closing arguments, the prosecutor improperly commented on his decision not to testify. He did not object at trial to the comments about which he complains on appeal. Therefore, we review this issue under the plain error rule. Rule 45A, Ala. R.App. P.

A.
The appellant argues that the prosecutor's comment, "There was an eyewitness and he told you what happened on the tape," constituted an improper comment on his decision not to testify.
"`[O]nce a defendant chooses not to testify at his trial the exercise of that choice is not subject to comment by the prosecution.' Wherry v. State, 402 So.2d 1130, 1133 (Ala.Cr.App.1981). `In determining if a prosecutorial remark impairs the integrity of the defendant's right not to testify the test is whether the defense can show that the remark[, given the context in which it was made,] was intended to comment on the defendant's silence or was of such character that a jury would naturally and necessarily construe it as a comment on the defendant's silence.' United States v. Le-Quire, 943 F.2d 1554, 1565 (11th Cir. 1991), cert. denied, 505 U.S. 1223, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992)."
Ex parte Davis, 718 So.2d 1166, 1173 (Ala. 1998). Defense counsel argued, during his guilt-phase closing argument, that the State's only basis for proving that the two murders were part of a continuous course of conduct was the appellant's statements to police. Defense counsel argued that alleged inconsistencies between the appellant's statements and witness testimony created a reasonable doubt that the murders were part of a continuous course of conduct. During the State's rebuttal argument, the prosecutor stated:
"If the deaths didn't happen at the same time, then what do you think happened? Where is there a reasonable doubt? We're not talking about a doubt. We're talking about a reasonable doubt. Do you think for a second that Barry Robinson â that after he killed Terry that Robinson just continued to sit there and wait a while for his turn? Is that logical? Is that believable, or is it more logical to believe it happened just like the defendant told you on the tape? Somebody said something about there not being an eyewitness in this case. There was an eyewitness and he told you what happened on the tape."
(R. 2959-60.) When viewed in context, this statement is an obvious comment about the appellant's taped statement to police that was admitted into evidence. It is apparent that the prosecutor did not intend to comment on the appellant's silence. Contrary to the appellant's argument on appeal, the prosecutor did not contrast the appellant's statements to police with his silence at trial. Furthermore, the comment was not "`of such character that a jury would naturally and necessarily construe it as a comment on the defendant's silence.'" Ex parte Davis, 718 So.2d at 1173 (citation omitted). Accordingly, the prosecutor's comment did not amount to plain error.

B.
Next, the appellant argues that the prosecutor's statements during the penalty-phase closing arguments concerning his lack of remorse constituted a comment on his decision not to testify. During the State's rebuttal closing arguments in the penalty phase, the prosecutor stated:
"This tape, they suggest to you, is a mitigating circumstance because of his candor and his remorse. It runs over two hours. In parts, like the part you just heard, [it] absolutely drags for seconds *22 if not minutes, with anybody having an opportunity to talk. We've heard from the psychologist for about an hour who told you what Corey Maples had told him, and we've also heard from Howard Battles and from the videotape about what the defendant told him, but the one thing we have not heard one time in this case; this tape that shows so much remorse, when he asked him there, `Do you have anything else you want to tell us about this?' he sits there and says `Well, no, I guess that's about it.' When did he say `I'm sorry' one time? When did he say `I hate it,' one time? When did he say `I feel sorry for the families,' one time? Not one iota of remorse; and they want to tell you that the tape shows remorse. You have seen the tape and you have heard the psychologist. When did he tell you how broken up he was and how sorry he was? He talked a lot about what a bad childhood he had. Did he tell you about what a bad impact these two killings had on him since? Not a word. The only thing that could even halfway arguably be called remorse is him talking about being haunted by these images. I guess he was haunted by these images up there at the Kentucky State Fair. I guess he was haunted by these images after he got the car fixed. He carried the dead man's car and got a new engine put in it on their warranty and was driving around and partying and going out like a young man would. He was tickled to get his car back. Haunted by these images? That sounds good but there hasn't been any evidence to support that; not one bit."
(R. 3286-88.) "Remorse is a proper subject of comment during sentencing." Travis v. State, [Ms. CR-92-0958, April 18, 1997] ___ So.2d ___ (Ala.Cr.App.1997); Dobyne v. State, 672 So.2d 1319, 1348-49 (Ala.Cr.App.), on return to remand, 672 So.2d 1353 (Ala.Cr.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996). Defense counsel, in his penalty-phase opening arguments, stated:
"We believe that tape also demonstrates his remorsefulness, in that he describes in the tape his being haunted by these images every night. He describes in this tape that he couldn't sleep, that finally when he was arrested he said, `Maybe now I can get some sleep.' In the tape he also describes that when he was arrested, the first words out of his mouth, we talked about it earlier, is `Thank God, it's finally over.'"
(R. 3090.) During his penalty-phase closing arguments, defense counsel again emphasized that "in the early morning hours of August 2, 1995, when he put his head in his hands and said when I saw the police cars, `Thank God it's finally over. I thought about this every night. Thank God it's finally over.'" (R. 3281-82.) The prosecutor's comments were a response to the defense's statements and insinuations that the appellant's confession showed his remorsefulness about the murders. The prosecutor's statements were reasonable inferences drawn from the evidence presented at trial, the appellant's statements to the police and to the psychologist, and the appellant's actions between the time of the murders and the time of his arrest. Furthermore, the prosecutor's statement, "Did he tell you about what a bad impact these two killings had on him since?," when read in context, does not refer, as the appellant argues, to his silence since the time he made the videotaped statement to police. Rather, it refers to the appellant's lack of remorse evidenced in his statements to police after the murders. Counsel is "`allowed wide latitude in drawing reasonable inferences from the evidence in closing arguments.'" Jones v. State, 600 So.2d 424, 425 (Ala.Cr.App.1992) (quoting Cross v. State, 536 So.2d 155, 160 (Ala.Cr.App.1988)). Accordingly, the prosecutor's statements do not rise to the level of plain error. See Frazier v. State, 758 So.2d 577 (Ala.Cr.App.1999); Dobyne, supra; Taylor v. State, 666 So.2d 36, 55 (Ala.Cr.App.), opinion extended on return *23 to remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).

III.
The appellant's third argument is that the trial court erred in refusing to instruct the jury on intoxication and manslaughter because there was evidence that he was using drugs and alcohol on the day of the murders. He did not request instructions on intoxication and manslaughter, and he did not object when the trial court did not give such charges. Therefore, we review this claim for plain error. Rule 45A, Ala. R.App. P.
The legislature has defined "intoxicated" to include "a disturbance of mental or physical capacities resulting from the introduction of any substance into the body." § 13A-3-2(e)(1), Ala.Code 1975. Thus, evidence of ingestion of alcohol or drugs, standing alone, is insufficient to support a charge on intoxication. In addition, there must be evidence that the ingestion caused a disturbance of the person's mental or physical capacities and that that mental or physical disturbance existed at the time the offense was committed. This interpretation is borne out by our decision in Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997), in which we held:
"In this case, however, there was no evidence that the appellant was intoxicated. Although there was evidence that the appellant had been drinking beer on the day of the robbery-murder, there was no evidence concerning the quantity of beer he consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated. There was no `reasonable theory' to support an instruction on intoxication because there was no evidence of intoxication. The court did not err in not instructing the jury on intoxication and manslaughter where there was no evidence that the appellant was intoxicated at the time the robbery-murder occurred."
683 So.2d at 1037 (emphasis added). Furthermore, instructions on intoxication and manslaughter are not required when they would be inconsistent with the defense strategy. As we held in Hunt v. State, 659 So.2d 933 (Ala.Cr.App.1994), aff'd, 659 So.2d 960 (Ala.), cert. denied, 516 U.S. 880, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995):
"The appellant contends that the trial court erred in failing to instruct the jury on voluntary intoxication.
"In his oral instructions to the jury, the trial judge instructed the jury on intentional murder and felony murder as lesser included offenses of the capital crimes charged in the indictment. Defense counsel raised no objection to those particular portions of the oral charge and, on one occasion, announced `satisfied.' R. 881, 882, 888. The trial judge repeatedly instructed the jury on the definition of intent and the requirement that the killing have been intentionally committed. Although there was evidence that the appellant had consumed alcohol and drugs shortly before the murder, the trial judge was not requested to and did not instruct the jury on the legal principles of intoxication in connection with criminal liability. No objection was made at trial to the court's failure to give such an instruction.
"In Fletcher v. State, 621 So.2d 1010 (Ala.Cr.App.1993), the trial court did not instruct the jury on the legal principles of intoxication and this Court found that that omission constituted plain error. In Fletcher however, the trial judge, sua sponte, stated at the close of the State's case that he would not give a charge on intoxication because he `"did not get the impression from the evidence that [the defendant] was so intoxicated that he didn't know what he was doing."' 621 *24 So.2d at 1018. We held that this determination by the trial court `"invaded the exclusive province of the jury,"' id. at 1021, and, under the particular facts involved, amounted to plain error.
"In contrast, in the instant case, the matter of an intoxication charge was not raised by anyone at the guilt phase of the trial. In fact, defense counsel objected to the references during the trial to the appellant's drug use and, in addition to the appellant's defense that he did not commit the murder, defense counsel suggested during closing argument that, at most, the evidence supported a conviction of intentional murder only. Thus, it appears that the appellant's defense strategy was to convince the jury either that he did not commit the murder or that the killing was intentionally done, but without sexual overtones. There was no claim that he was unable to form the intent to kill because he was intoxicated. Where, as in this case, an intoxication instruction would conflict with defense strategy, there is no plain error in the trial court's failure to give such an instruction. Gurley v. State, 639 So.2d 557, 560-61 (Ala.Cr.App. 1993)."
659 So.2d at 957-58. Finally, under § 13A-1-9(b), Ala.Code 1975, a trial court is not required to instruct on a lesser included offense "unless there is a rational basis for a verdict convicting the defendant of the included offense."
The testimony at trial did not establish that the appellant was intoxicated at the time of the murders. Although there was some testimony that he had ingested alcohol several hours before the murders occurred, there was no testimony that he was intoxicated at the time of the murders. Also, there was no evidence that he had ingested drugs before the murders. Thus, there was no rational basis for instructions on intoxication and manslaughter under the evidence presented in this case.
Furthermore, instructions on intoxication and manslaughter would have been inconsistent with his defense strategy. At trial, the appellant specifically contended that he was not intoxicated at the time of the murders. He also contended that, at most, he was guilty of two intentional murders, but not two counts of capital murder. Thus, the trial court did not err in not instructing the jury on intoxication and manslaughter.

IV.
The appellant's fourth argument is that the search of his motel room was illegal and that, therefore, a "No Fear" T-shirt[1] seized pursuant to that search was not admissible at trial. Specifically, he argues that his roommate was coerced into consenting to the search and did not have authority to consent to the search of the motel room or the bag in which the T-shirt was found. Because he did not argue at trial that the T-shirt was inadmissible on the grounds that he now asserts on appeal, we must review this claim for plain error. Rule 45A, Ala. R.App. P.
The evidence showed that, during July and August of 1995, the appellant shared a motel room with Stephen Tant, who worked as a desk clerk for a motel in Nashville and was allowed to live in the room as part of his pay. Tant testified that he allowed the appellant to live with him in his motel room for a few weeks while the appellant's vehicle was being repaired. (R. 2439-40.) He stated that he did not know that the appellant was suspected of committing two murders in Alabama until police officers arrested the appellant at the motel on August 1, 1995. At that time, he consented to a search of the motel room. He testified that he was not coerced into consenting to the search; in fact, he testified that he suggested that he sign a paper so the officers could conduct the search. (R. 2449.) The State introduced into evidence, without objection, two *25 consent-to-search forms, one signed by Tant on the day of the appellant's arrest and the other signed by Tant on the day after the appellant's arrest. (State's Exhibits 203 and 204.)
The appellant claims that Tant was coerced into consenting to the first search of the room because the police were armed with guns when they sought to search the room.
"The question whether a consent to a search is voluntary is a question of fact for the trial court to determine, based upon the totality of the circumstances. Bender v. State, 687 So.2d 219, 221 (Ala. Cr.App.1996). No particular factor should be given undue weight in determining the issue of voluntariness. The fact that a defendant was not informed of the right to refuse to consent does not, of itself, negate a finding of voluntariness. Nor does the fact that the defendant was in police custody or that the officers made a showing of force. Kennedy v. State, 640 So.2d 22, 24-5 (Ala.Cr.App.1993), quoting Martinez v. State, 624 So.2d 711, 715-16 (Ala.Cr. App.1993)."
Rokitski v. State, 715 So.2d 859, 861-62 (Ala.Cr.App.1997). Furthermore, consent to search may be given by a third party who possesses common authority over the premises or personal effects sought to be searched. James v. State, 681 So.2d 269 (Ala.Cr.App.1996); Smiley v. State, 606 So.2d 213 (Ala.Cr.App.1992); United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974).
The evidence showed that the police were armed with guns at the time of the first search because they had surrounded the motel to capture and arrest the appellant. However, there is no indication that they used the guns to coerce Tant into consenting to the search. Tant testified that he was not coerced into consenting to the search and that, in fact, he suggested that the officers conduct a search of the premises. Further, Stella Marger, a motel employee, testified that she saw Tant sign the consent-to-search form and that he did so willingly and without coercion. (R. 2435-36.) Additionally, Detective Clifford Mann testified that Tant willingly signed a consent for police officers to search the motel room for incriminating evidence. (R. 2466.) Therefore, based on the totality of the circumstances, there is no indication that Tant was coerced into consenting to the search of the motel room.
Next, the appellant argues that Tant did not have the authority to consent to a search of the motel room or the bag in which the incriminating T-shirt was found. In Quinn v. State, 611 So.2d 483 (Ala.Cr. App.1992), we held:
"Police can lawfully search a motel room without a warrant pursuant to the consent of the person in whose name the room is registered. Mitchell v. State, 391 So.2d 1069 (Ala.Cr.App.1980); Bridges v. State, 52 Ala.App. 546, 295 So.2d 266 (1974). Further, `permission to search [may also be] obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.' [United States v.] Matlock, 415 U.S. [164], 171, 94 S.Ct. [988], 993[, 39 L.Ed.2d 242] (1974) (footnote omitted) (emphasis added [in Turner.])
"In Matlock, the United States Supreme Court defined `common authority' as the `mutual use of property by persons generally having joint access or control for most purposes.' 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7.... Determining whether an individual has common authority to consent to a search is `"judged against an objective standard: would the facts available at the moment... `warrant a man of reasonable caution in the belief" that the consenting party had authority over the premises?' Illinois v. Rodriguez, 497 U.S. 177, 188, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990) (quoting Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968))." *26 611 So.2d at 485-86 (emphasis in second paragraph added). Here, Tant testified that he was allowed to live in the motel room as part of his pay and that he allowed the appellant to live in the room with him for a few weeks. He further testified that he voluntarily signed a consent form for police officers to search the room on two different occasions. Because the evidence showed that Tant was a joint occupant of the motel room and that he had joint access to the room, he had the authority to consent to a search of the room. James v. State, 681 So.2d 269, 272 (Ala.Cr.App.1996) (holding that, where the appellant's roommate signed a consent form to allow police to search the bedroom she shared with the appellant in her parents' house, the trial court did not err in admitting into evidence items seized from the bedroom); see also Quinn, supra.
The appellant further argues that, because Tant was not a joint user of the bag, he could not authorize a search of the bag. We disagree. A third party can consent to the search of the accused's personal effects where that third party has "common authority" over the item to be searched. See Quinn, supra. When an accused leaves property in the joint control of another or in a place where one could not reasonably expect to exclude others, he assumes the risk that the joint occupant will consent to a search of the property. See Cowart v. State, 579 So.2d 1, 4-5 (Ala. Cr.App.1990). After the officers advised him of his Miranda rights, the appellant told them, "My No Fear T-shirt had blood on it. I still have it. It is in a laundry bag back at the motel room here in Nashville." (State's Exhibit 233) (emphasis added). During the second search, officers found the T-shirt in a clear plastic bag located in plain view in the floor of the only closet in the motel room. Furthermore, the closet was open; there was no door attached to it. Therefore, police officers could have reasonably believed that Tant had "common authority" over the contents of the closet, including the bag in which the T-shirt was found. See Rieber v. State, 663 So.2d 985 (Ala.Cr.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995); Cowart, 579 So.2d at 4-5 (Ala.Cr. App.1990). For these reasons, the trial court properly admitted the T-shirt into evidence.

V.
The appellant's fifth argument is that the trial court erroneously refused to remove for cause two veniremembers who allegedly would automatically impose a death sentence upon a person convicted of capital murder. In determining whether a veniremember should be excused for cause, the trial court should consider
"`whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence. Tidmore v. City of Birmingham, 356 So.2d 231 (Ala.Cr.App. 1977), cert. denied, 356 So.2d 234 (Ala.), cert. denied, 439 U.S. 836, 99 S.Ct. 120, 58 L.Ed.2d 132 (1978); see Willingham v. State, 262 Ala. 550, 552, 80 So.2d 280 (1955); Mahan v. State, 508 So.2d 1180 (Ala.Cr.App. 1986). This determination, again is to be based on the juror's answers and demeanor and is within the sound discretion of the trial judge.'"
Ex parte Windsor, 683 So.2d 1042, 1047 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997) (quoting Knop v. McCain, 561 So.2d 229, 232 (Ala.1989)) (emphasis added).
"[A] veniremember's personal feelings as to the law are immaterial unless those feelings are so unyielding as to preclude the veniremember from following the law as given in the court's instructions. `A veniremember who believes that the death penalty should automatically be imposed in every capital case should be excused.' Martin v. State, 548 So.2d 488, 491 (Ala.Cr.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 *27 (1989). However, veniremembers who favor the death penalty should not be excused for cause where they indicate they can follow the court's instructions. Id."
Smith v. State, 698 So.2d 189, 198 (Ala.Cr. App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997) (emphasis added).

A.
The appellant argues that the trial court should have removed veniremember L.S. for cause because she stated that the death penalty should automatically be imposed in intentional murder cases. During voir dire examination by defense counsel, L.S. indicated that she would automatically impose the death penalty upon a person who intentionally murdered another unless that person clearly acted in self-defense. (R. 843-46.) Defense counsel did not question L.S. any further regarding her opinion about the death penalty. However, in an attempt to clarify the veniremembers' opinions about the death penalty, the trial court asked them whether they would be able to put aside their personal feelings and consider the law, including aggravating and mitigating circumstances, during the penalty phase of the trial. In particular, the following discussion occurred between L.S. and the trial court:
"[L.S.]: That he killed somebody for any reason other than self-defense, my personal feelings about it is I would find it hard not to give him the death penalty.
"The Court: I respect your personal feelings about it; but I'm asking you will you be able to put aside your personal feelings and follow the law of the land and the instructions that I give you and seriously and genuinely weigh these factors that the law requires you to consider before you actually vote in a penalty phase of this trial?
"[L.S.]: Yes, I could.
"The Court: You would put aside your personal feelings and follow the law?
"[L.S.]: Yes."
(R. 883-84.) Shortly thereafter, defense counsel expanded upon the trial court's line of questioning as follows:
"[Defense counsel]: [L.S.], I have a follow-up to Judge Thompson's question. If you got to that sentencing phase and you had been convinced beyond a reasonable doubt that someone had intentionally murdered someone, beyond a reasonable doubt, and Judge Thompson instructed you on what the law was, would you feel like it's your obligation to sentence someone to death under those circumstances; despite what Judge Thompson instructed you on the law?
"[L.S.]: If it was the law, I would have to follow the law. I would put my personal feelings aside and follow the law because if I didn't do that, I wouldn't be any better than anybody else that committed crimes."
(R. 885-86.)
L.S. clearly indicated that she would follow the law and weigh the evidence during the penalty phase of the trial. She stated that she would lay aside her personal feelings and apply the law fairly to the facts presented in the case. Therefore, the trial court properly refused to excuse L.S. for cause on this ground.
The appellant further argues that the trial court should have removed L.S. for cause because she indicated that, if an accused confessed to committing an intentional murder, then that confession would eliminate any doubt in her mind about his guilt. During voir dire examination, L.S. responded to questions from defense counsel and the trial court regarding her opinion about confessions and the imposition of the death penalty. When defense counsel asked L.S. if the trial would be over in her mind once she heard a confession from the accused, and she responded:
"Not necessarily. I would listen to the rest of the evidence, but if it was leaning *28 that way and he said,' I confess, I did it,' then that would make up my mind right there."
(R. 828-29.) Later, the trial court asked L.S. whether she would be able to weigh the evidence and determine whether the confession was credible and given voluntarily without coercion. L.S. indicated that, although she would place great weight on a confession from the accused, she would consider all of the evidence from both sides regarding the credibility of the confession. (R. 877-880.) Because L.S. clearly indicated that she would weigh the evidence in determining whether the confession was credible, the trial court properly refused to remove L.S. for cause on this ground.

B.
The appellant argues that the trial court should have removed veniremember J.W. for cause because he indicated that he would automatically vote for the death penalty in a case of intentional murder. However, the appellant did not challenge J.W. for cause on this ground at trial. Therefore, we must review this claim for plain error. Rule 45A, Ala. R.App. P. During voir dire examination by defense counsel, J.W. indicated that he would automatically vote to impose the death penalty upon a person convicted of intentional murder. (R. 1093-94.) After other potential jurors indicated that they also would automatically impose the death penalty in cases of intentional murder, defense counsel asked the veniremembers whether they would consider any aggravating and mitigating circumstances in making their decision to impose the death penalty or whether they would automatically impose it if there was evidence of an intentional murder. (R. 1096-98.) J.W. responded:
"I mean, you would have to look at what the law allows. That's what I would look at. If it allows death and that's what they prove, that's what I would do. If they didn't prove the fact that it was aggravated and the law didn't allow the death penalty, then no."
(R. 1098-99.) Further, when the trial court asked the veniremembers whether they could follow the law and consider aggravating and mitigating circumstances in the penalty phase of the trial, J.W. responded that he could. (R. 1101-03.) It is clear from J.W.'s responses during voir dire examination that he indicated he would follow the law and weigh the evidence fairly in the penalty phase of the trial. Thus, the trial court properly refused to excuse him for cause on this ground.
The appellant also argues that the trial court should have removed J.W. for cause because he was a police officer who "was privy to confidential information about the case." During voir dire examination, the appellant challenged J.W. for cause because he was a police officer and he allegedly had information about this case due to his contact with some of the investigators in the case. J.W., a police officer in the Town of Sommerville, stated that his police department received a fax about a month before trial that contained trial dates and witnesses to be subpoenaed in a number of different cases. (R. 924, 970.) He indicated that such faxes were routinely sent to all law enforcement offices to let the officers know when they were scheduled to appear in court to testify. (R. 1067-68.) Although the appellant contends that the fax contained confidential information about his case, J.W. stated that the fax did not disclose anything about the appellant's case and that it did not even contain the appellant's name. (R. 1067-68.) J.W. also indicated that he knew some of the investigators who might testify at the appellant's trial, but he stated that he did not have any personal knowledge of the facts surrounding the appellant's case. (R. 1068.) Therefore, the appellant's claim that J.W. was privy to confidential information about his case so that he should have been removed for cause is without merit. Accordingly, the *29 trial court did not err in refusing to remove J.W. for cause on this ground.

VI.
The appellant's sixth argument is that the trial court improperly sentenced him to death. Specifically, he argues that the trial court improperly rejected evidence of three statutory mitigating circumstances: 1) the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance, § 13A-5-51(2), Ala. Code 1975; 2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, § 13A-5-51(6), Ala.Code 1975; and 3) the age of the defendant at the time of the offense, § 13A-5-51(7), Ala.Code 1975. The appellant also claims that the trial court improperly rejected evidence of non-statutory mitigating circumstances. However, he specifically argues only that the trial court improperly rejected evidence that he had assisted police officers in apprehending drug dealers. Because the appellant did not present any of these claims to the trial court, we review them for plain error. Rule 45A, Ala. R.App. P.
In reviewing this issue, we are guided by the following principles:
"A sentencer in a capital case may not refuse to consider or be `precluded from considering' mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987)."
Williams v. State, 710 So.2d 1276, 1347 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). See also Boyd v. State, 715 So.2d 825, 840 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998). Further,
"the decision as to whether a particular mitigating circumstance is sufficiently proven by the evidence and the weight to be accorded to it rests with the trial court. See Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), affirmed, 603 So.2d 412 (Ala.1992).
"`"`Although consideration of all mitigating circumstances is required by the United States Constitution, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the decision of whether a particular mitigating circumstance in sentencing is proven and the weight to be given it rests with the judge and jury. Lucas v. *30 State, 376 So.2d 1149 (Fla.1979).' Smith v. State, 407 So.2d 894, 901 (Fla.1981)."'

"Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr.App.1984), affirmed, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). See also McWilliams v. State, [Ms. 6 Div. 190, August 23, 1991] 640 So.2d 982 (Ala. Cr.App.1991)."
Giles v. State, 632 So.2d 568, 572 (Ala.Cr. App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994).
In its sentencing order, the trial court made the following findings regarding statutory and nonstatutory mitigating circumstances:

"The mitigating circumstances. The defense asserted the presence of mitigating circumstances. Although the defense did not rely on all of the statutory mitigating circumstances, the court reviews all of the statutory mitigating circumstances in this sentencing order.
"1. The Defendant has no significant history of prior criminal activity. See Ala.Code § 13A-5-51(1)(1994 repl. vol.). The court finds this mitigating circumstance is present in this case. The District Attorney conceded this point during the sentencing phase of the trial, and the court concurs.
"2. The capital offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance. See Ala.Code § 13A-5-51(2)(1994 repl. vol.). The Court finds this mitigating circumstance is inapplicable.
"The Defense asserts that the Defendant had been drinking beer the night of the murders and had a history of drug addiction. The Defense further alleges that this substance abuse was extensive and a triggering factor in the events of July 7 and July 8. This evidence falls woefully short of the statutory mitigating circumstance that the offender was under the influence of extreme mental or emotional disturbance. Dr. Alan Shealey, a clinical forensic psychologist testifying for the Defendant, presented evidence that the Defendant's background and history fit a profile of a passive-aggressive personality. This profile resulted from Dr. Shealey's feeding a computer program information provided by the Defendant in an interview. The court notes the State psychologist did not markedly differ from Dr. Shealey's report. Both doctors agreed the Defendant was fit to stand trial and [that he] understood the difference between right and wrong. The only difference between the two experts [was that] the Defendant's expert testified [that] alcohol and past drug abuse might be a trigger for the actions taken by the Defendant on the night of July 7, 1995. However, the Defendant, in a videotaped confession, denied the use of drugs on the night of the murders and robbery.
"3. The victim was a participant in the Defendant's conduct or consented to it. See Ala.Code § 13A-5-51(3)(1994 repl. vol.). The court finds this mitigating circumstance is inapplicable.
"The statutory mitigating circumstance that the victim was a participant in the criminal act or consented to that act was neither asserted nor proved. It simply is not an issue in this case. The court rejects this mitigating circumstance.
"4. The Defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor. See Ala.Code § 13A-5-51(4)(1994 repl. vol.). The Court finds this mitigating circumstance is inapplicable.
"No evidence exists to lead this court to believe the Defendant was a minor actor in this capital murder. Quite the contrary, the evidence shows the Defendant asserted he alone killed the two men. This mitigating circumstance was *31 neither asserted nor proved; the court rejects this mitigating circumstance.
"5. The Defendant acted under extreme duress or under the substantial domination of another person. See Ala. Code § 13A-5-51(5)(1994 repl. vol.). The Court finds this mitigating circumstance is inapplicable.
"No evidence exists to lead this court to believe the Defendant acted under extreme duress or under the substantial domination of another person. Quite the contrary, the evidence shows the Defendant asserted he alone killed the two men with no external influences. This mitigating circumstance was neither asserted nor proved; the court rejects this mitigating circumstance.
"6. The capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. See Ala.Code § 13A-5-51(6)(1994 repl. vol.). The court finds this mitigating circumstance is inapplicable.
"The court notes the Defense never specifically addressed this particular mitigating circumstance. While the defense does assert [that] the defendant had been drinking alcohol extensively during the period before the crime, the evidence falls short of supporting the assertion the Defendant was so impaired by alcohol he could not appreciate the criminality of his conduct. The court notes the Defendant stole the vehicle of Stacy Terry and fled the state because he knew the authorities would be after him. The court finds such evidence too weak and unpersuasive to support this statutory mitigating circumstance.
"7. The age of the Defendant at the time of the crime. See Ala.Code § 13A-5-51(7)(1994 repl.vol.). The court finds this mitigating circumstance is inapplicable.
"The Defendant was 21 years of age at the time of this capital murder. The court is not persuaded this constitutes a mitigating circumstance. Although the age of an offender may be an important consideration in deciding punishment, a 21-year-old offender is not so youthful the Court should treat him differently than other adults.
"8. § 13A-5-52. Mitigating Circumstances â Inclusion of Defendant's character, record, etc. The court finds evidence of this circumstance in this case.
"The defense presented seven nonstatutory mitigating circumstances to be considered in the sentencing phase of the trial. They are as follows:
"(1) That the Defendant suffered abuse, neglect, and abandonment by his birth mother during his childhood. The court does not doubt the abandonment of the Defendant by his birth mother as introduced into evidence by the Defendant's psychologist and the Defendant's family. However, the Court also notes the testimony supports the fact that the Defendant has good relations with his step-mother, who he has known as his mother since the Defendant was the age of three. The psychologists' testimony and testimony from the Defendant's family lead one to the inescapable conclusion that Corey Ross Maples is a troubled young man with a history of abuse from his mother and self-abuse through drugs and alcohol.
"(2) That the Defendant has suffered from past drug dependency. Testimony elicited throughout the trial from various witnesses, including the Defendant, established the Defendant had a drug dependency on marijuana, crystal methamphetamine, crack, and various other illegal controlled substances. The court does not doubt the testimony the Defendant has suffered from addiction to various controlled substances.
"(3) That the Defendant has made efforts at controlling his drug dependency in drug rehabilitation. Testimony elicited from the Defendant's father and stepmother established the Defendant spent *32 some time in the latter half of 1994 at the Quest Recovery Program for Drug Addiction. The court finds this testimony credible.
"(4) That the Defendant has cooperated and assisted law enforcement authorities in its enforcement of drug law violations. The Defendant's stepmother testified the Defendant had assisted the Decatur Police Department in apprehending a drug violator. The court notes no police officer testified at trial, nor was there any corroboration of the stepmother's testimony.
"(5) That the Defendant had diminished mental capacity at the time of the crime due to his consumption of alcohol.
"While the defense presents this as a mitigating factor, the Court fails to be convinced by the conflicting testimony at trial that this is a mitigating factor. The Defendant acknowledges no inordinate amount of alcohol consumption on the evening of the murder, nor is there any evidence that the amount of alcohol consumption on the evening of July 7, 1995, was any different than any other night.
"(6) That the Defendant displayed remorse and candor in his videotaped confession to law enforcement authorities and further during this confession he accepted full responsibility of the murder of Stacy Terry and Barry Robinson II.
"The court has considered this nonstatutory mitigating circumstance and finds the Defendant did candidly speak of the events of July 7 and July 8, 1995. The court is not persuaded the Defendant exhibited any remorse over the consequences of his actions. While the Court commends the Defendant's candor, the court finds no evidence of remorse.
"(7) That the crime was absent of any prolonged suffering or torture by either of the Decedents.
"While the defense presents this as a mitigating factor, the Court fails to be convinced by the testimony at trial that this is a mitigating factor.
"Weighing the Circumstances
"The court now proceeds to weigh the aggravating and mitigating circumstances to determine the appropriate sentence under the law. The Court has not merely tallied for the purpose of numerical comparison the aggravating and mitigating circumstances, but has marshalled and considered in an organized fashion all of the relevant circumstances.
"The evidence proves beyond a reasonable doubt the existence of one statutory aggravating circumstance. The defense did prove by a preponderance of the evidence that the Defendant has no significant history of prior criminal activity. Insofar as the Defense attempted to assert the presence of several statutory mitigating circumstances, the facts failed to meet the definition of the circumstance or the evidence disproved the factual existence of the circumstance by at least a preponderance of the evidence. The court did weigh several non-statutory mitigating circumstances in addition to the one statutory mitigating circumstance, but found them weak and unpersuasive.
"The court is unable to find the kind of mitigating facts that would justify the imposition of a sentence of life imprisonment without parole despite the existence of one statutory aggravating circumstance. The statutory aggravating circumstance far outweighed the mitigating facts. The court considered the jury's recommendation as required by law. See Ala.Code 13A-5-47(e) (1994 repl. vol.). The court, though, understands the jury's verdict does not require this court to impose the sentence of death."
(C.R.560-565.)
The trial court allowed the appellant to present all of the mitigating evidence he *33 wanted to present, and its sentencing order clearly indicates that it considered all of the mitigating evidence the appellant presented. Although the trial court did not give much weight to the nonstatutory mitigating evidence, it did find that several of the circumstances mitigated the offense. "`While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.'" Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997) (quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Cr.App. 1989)). See also Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994); Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Although the trial court must consider all mitigating circumstances, it has discretion in determining whether a particular mitigating circumstance is proven and the weight it will give that circumstance. Carroll v. State, supra; Williams v. State, supra; Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). The trial court complied with Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny in evaluating the mitigating evidence offered by the appellant. Therefore, it did not improperly sentence the appellant to death.

VII.
The appellant's seventh argument is that the trial court improperly denied his discovery motions and improperly refused to view what he alleges were withheld documents in camera.[2] He contends that, as a result, the trial court "critically curtailed the capacity of the defense to mount a challenge to the State's evidence." (Appellant's brief at p. 55.) In support of his argument, the appellant cites Ex parte Monk, 557 So.2d 832 (Ala. 1989). We will discuss each of the motions in turn, but first we make the following observations about discovery in criminal cases:
"In Alabama, there is no constitutional right to discovery in a criminal case. Rule 19, Alabama Rules of Criminal Procedure, affords an accused, a limited right of discovery in a pending criminal action. The extent of discovery is within the discretion of the trial court. As this court stated in Mason v. State, [Ms. CR-94-2143, March 6, 1998] ___ So.2d ___, ___ (Ala.Cr.App.1998):
"`While Monk does encourage liberal discovery in capital murder cases, it does not mandate that the state disclose to a defendant the name and address of every individual who has furnished information to the state in the investigation of a crime; rather, "Monk made it clear that whether to order discovery beyond that required by the constitution or by state law or rule is discretionary with the trial court." Council v. State, 682 So.2d 500, 501 (Ala.1996) (Hooper, C.J., concurring specially in denial of certiorari review).'"
Ex parte Land, [Ms. CR-97-1473, July 2, 1998] ___ So.2d ___ (Ala.Cr.App.1998) (emphasis original). A trial judge may order more extensive discovery when a defendant is facing the death penalty, but Monk does not require that the judge do so. Rather, the extent to which discovery will be allowed lies within the discretion of the trial court.

A.
First, the appellant argues that the trial court improperly denied his request for discovery of files and records from various state agencies, organizations, or individuals who maintained records *34 about him. The trial court noted that it was not the prosecutor's responsibility to obtain the information for the appellant. (R. 213.) However, contrary to the appellant's assertion, the trial court ruled that the appellant might be entitled to discovery of some of the information. (R. 213.) Therefore, it instructed the appellant to subpoena the files and agreed that it would conduct hearings if objections were made. (R. 214.) Defense counsel admitted during the hearing on the motion that that assistance was what he actually sought when he filed the motion for discovery of the files. (R. 214.)
Subsequently, the defense issued subpoenas to the various agencies, organizations, and individuals. Some of the subpoenas requested not only information about the appellant, but also information about 20 other individuals connected with the case. The prosecutor moved to quash the subpoenas relating to third parties, and the trial court conducted a hearing to determine what, if any, information the defense might be entitled to obtain. At the hearing, defense counsel represented to the trial court that nine entities had complied with the subpoenas by either sending the information or stating that they did not have the requested information; six others had not complied with the subpoenas at the time of the hearing. (R. 313-18.) The Alabama Board of Pardons and Paroles, through counsel, appeared at the hearing, specifically objecting to the request for information about 20 individuals other than the appellant. (R. 318-19.) At the hearing, the trial court allowed the prosecutor, defense counsel, and counsel for the Alabama Board of Pardons and Paroles to present arguments concerning the subpoenas. Regarding the request for information relating to the 20 other individuals, defense counsel admitted that the defense was "wandering in a blind alley as far as what is in these files." (R. 326.) The defense could not cite anything specific that it sought, although it argued that the information could be useful as mitigating evidence. The trial court ordered that the remaining entities produce all of the requested information regarding the appellant. (C.R.429.) With respect to the request for information about the other 20 individuals, the trial court ruled:
"[T]he defendant must make the evidence appear to be relevant and material to the issues before the Court. A subpoena duces tecum is not intended as a `general fishing expedition.' Sale v. State, 570 So.2d 862 (Ala.Cr.App.1990).
"During oral arguments regarding these matters, the defense counsel stated, `... we are wandering in a blind alley as far as what are in these files....' The Court is of the opinion that statements such as this are illustrative of a fishing expedition. The Court finds that the defense has failed to show this Court that the information sought by said subpoenas is either material or relevant to the issues which are before this Court."
(C.R.429-29a.) The appellant did not make any further attempt to show that the information sought was relevant or material.
The trial court properly ordered production of the information related to the appellant, and properly denied, as part of "a fishing expedition," the request for information relating to 20 other individuals, absent a showing of relevance and materiality. As we held in Sale v. State, 570 So.2d 862 (Ala.Cr.App.1990):
"It appears to this Court that the defendant was seeking to use the subpoenas duces tecum as a method of discovery. In Alabama, a subpoena duces tecum does not `embrace[] discovery as one of its purposes,' Ex parte Anniston Personal Loans, Inc., 266 Ala. 356, 359, 96 So.2d 627, 630 (1957); Williams v. State, 383 So.2d 547, 559 (Ala.Cr.App. 1979), affirmed, 383 So.2d 564 (Ala.), cert. denied, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980), and should not be employed as a `fishing expedition,' Ex *35 parte Darring, 242 Ala. 621, 624, 7 So.2d 564, 566 (1942).
"`A subpoena for documents may be quashed if their production would be "unreasonable or oppressive," but not otherwise. The leading case in this Court interpreting this standard is Bowman Dairy Co. v. United States, 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879 (1951). This case recognized certain fundamental characteristics of the subpoena duces tecum in criminal cases: (1) it was not intended to provide a means of discovery for criminal cases, id., at 220, 71 S.Ct. 675 [at 679]; (2) its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials, ibid. ... [I]n order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."
"`. . . .
"`Enforcement of a pretrial subpoena duces tecum must necessarily be committed to the sound discretion of the trial court since the necessity for the subpoena most often turns upon a determination of factual issues.'
"United States v. Nixon, 418 U.S. 683, 698-99, 702, 94 S.Ct. 3090, 3103-04, 41 L.Ed.2d 1039 (1974) (footnotes omitted) (emphasis in original)."
Sale, 570 So.2d at 863-64. Thus, we do not find that the trial court abused its discretion in this regard.

B.
Second, the appellant argues that the trial court improperly denied discovery of jury-system records. He contends that the ruling prevented him from showing discrimination in the selection and formation of the grand and petit juries in his case. With regard to the grand jury records, the trial court granted the appellant access to the remand record from Pace v. State, 714 So.2d 332 (Ala.1997), on return to remand, 714 So.2d 340 (Ala.Cr.App.), cert. denied, 523 U.S. 1051, 118 S.Ct. 1372, 140 L.Ed.2d 520 (1998), in which the grand jury system in Morgan County was explained in detail. During a motion hearing, the trial court and prosecutor explained to the defense, on the record, the procedure by which the foreperson of the grand jury that indicted the appellant was chosen. Specifically, they explained that the judge presiding over the grand jury proceedings drew the foreperson's name at random from the names of all of the grand jury members. (R. 52, 69.) The trial court ordered that the defense be given a transcript, if any, of the instructions given to the grand jury that indicted the appellant regarding how the foreperson would be selected and of all of the grand jury proceedings regarding his case that occurred in open court. (R. 63-64, 68-69.) It further ordered that the defense could have access to the name, age, sex, and race of each member of the grand jury that indicted the appellant. (R. 59-60.) After granting all of the above-referenced discovery, the trial court agreed that it would reserve ruling on the appellant's objection to the composition of the grand jury until the appellant could obtain the discovery and present his specific objections. However, the appellant did not subsequently challenge the composition of the grand jury.
With regard to the petit jury records, the trial court again incorporated by reference the Pace record. It also explained to the defense, on the record, the procedure by which potential petit jurors *36 are selected in Morgan County. The trial court denied the appellant's motion challenging the composition of the petit jury for systematic underrepresentation of cognizable groups because the petit jury had not yet been selected in the case. However, it noted that the appellant could refile the motion later if he found some specific ground he wanted to raise in support of his challenge. The appellant did not subsequently raise this issue again. Because defense counsel admitted that the motion was "somewhat speculative" when it was filed, the trial court's ruling was proper.
The appellant also argues that the trial court improperly denied his request for funds to hire an expert to help prepare and present his claims concerning discrimination in the formation of the grand and petit juries. We addressed a similar claim in Finch v. State, 715 So.2d 906 (Ala.Cr. App.1997), in which we held:
"The appellant ... argues the trial court denied him his right to a fair trial by denying his pretrial `Motion For Funds For Expert Assistance To Investigate Grand and Petit Jury Venires.' The motion requested funds to employ an investigator, a statistician, a sociologist, and a jury selection expert to challenge the constitutionality of the current method of selection of the grand jury and petit jury venires in Jefferson County. The appellant's argument is without merit.
"In [Ex parte] Moody, [684 So.2d 1114[114] (Ala.1996),] the Alabama Supreme Court defined the standard by which a trial court must assess an indigent defendant's request for expert assistance.
"`Although the [United States] Supreme Court has not specifically stated what "threshold showing" must be made by the indigent defendant with regard to the need for an expert, the Court refused to require the state to pay for certain experts when the indigent defendant "offered little more than undeveloped assertions that the requested assistance would be beneficial." Caldwell v. Mississippi, 472, U.S. 320 at 323, 105 S.Ct. 2633 at 2637, 86 L.Ed.2d 231 (1985). As we stated in Dubose [v. State, 662 So.2d 1189, (Ala.1995)] the Supreme Court cases of Ake [v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)] and Caldwell, viewed together, seem to hold that an indigent defendant must show more than a mere possibility that an expert would aid in his defense. "Rather, the defendant must show a reasonable probability that an expert would aid in his defense and [must show that] a denial of an expert to assist at trial would result in a fundamentally unfair trial." Dubose, 662 So.2d at 1192, citing Moore v. Kemp, 809 F.2d 702 (11th Cir.), cert. denied, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987).
"`. . . .
"`Based on the foregoing, we conclude that for an indigent defendant to be entitled to expert assistance at public expense, he must show a reasonable probability that the expert would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense. If the indigent defendant meets this standard, then the trial court can authorize the hiring of an expert at public expense.'
"684 So.2d at 119. See also Burgess v. State, [Ms. CR-93-1147, August 22, 1997] 723 So.2d 742 (Ala.Cr.App.1997); MacEwan v.State, 701 So.2d 66 (Ala.Cr. App.1997); Ex parte Dobyne, 672 So.2d 1354, 1357 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996).

*37 "Applying this standard to the appellant's request for expert assistance, we cannot say that, by refusing his request, the trial court denied the appellant his right to a fair trial.... The appellant has failed to show with reasonable specificity that the experts he requested would have provided information related to any question or issue raised by the State at trial or would have been relevant to any element of the crimes for which he was charged. Rather, the appellant's argument is based merely on an `expectation' that the requested assistance would have been beneficial to his defense. Caldwell, supra. In a similar case, this court recently upheld an order denying funds for a statistical expert requested by an indigent defendant to assist in challenging the jury venire in Tuscaloosa County. See May v. State, 710 So.2d 1362, 1366 (Ala.Cr.App.1997). In May, we stated that the defendant failed to `make a threshold showing ... that the statistical expert would be of assistance' because his `request was supported solely by his assertion that the venire was not a fair cross-section of the community.' Id. Furthermore, we have already held that the random selection of jurors from a list of licensed drivers is an acceptable manner by which to select a jury venire. Sistrunk v. State, 630 So.2d 147 (Ala.Cr.App.1993).
"Therefore, the trial court did not deprive the appellant of his right to a fair trial by denying his request for expert assistance to investigate the juror selection process in Jefferson County."
715 So.2d at 910-11. Similarly, in this case, the appellant did not make a threshold showing that an expert would probably assist his defense and that the denial of the expert would result in a fundamentally unfair trial. Rather, he admitted that he was simply speculating that there had been discrimination in the selection of the grand and petit juries. Jurors in Morgan County are selected at random from a list of licensed drivers, and we have approved that system. See Finch, supra. Therefore, because the appellant did not make the required showing of need, the trial court did not abuse its discretion in denying his request for expert assistance.

C.
Third, the appellant argues that the trial court improperly refused to order discovery of evidence that was crucial to his defense. Specifically, he requested discovery of information about another murder he was suspected of committing, criminal records of two prosecution witnesses, and evidence implicating either of the witnesses in the instant offense. He also contends that, because the trial court did not order the production of the requested information, it should have reviewed the documents in camera
In its general discovery order, the trial court ordered the prosecution to give the appellant any "exculpatory material or other material to which a defendant is entitled under constitutional provisions or other provisions of law." (C.R.337.) During a pretrial motion hearing, the prosecutor agreed that, because they would be discoverable, he would produce all statements the appellant made to law enforcement officers. (R. 157.) He also represented to the trial court and to defense counsel that he did not know that any file or documents existed in relation to an investigation of the other murder or to the two witnesses. (R. 172.) With the exception of the request for exculpatory material, the trial court denied the appellant's request. However, it did instruct the prosecutor to determine whether any file related to the other murder existed and, if so, to produce any exculpatory material from that file. In so doing, the trial court declined to conduct an in camera review of the documents at that time. However, it did state that the appellant could obtain further review if the documents produced indicated that other information had not been produced, and that the prosecutor could obtain guidance if he had questions in attempting to comply with its order.
*38 The trial court clearly attempted to provide information the appellant was entitled to receive. However, the defense does not have an absolute right to disclosure of the criminal records of the State's witnesses. Davis v. State, 554 So.2d 1094 (Ala.Cr.App.1984), aff'd, 554 So.2d 1111 (Ala.1989), opinion on reh'g, 569 So.2d 738 (Ala.1990), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991); Wright v. State, 424 So.2d 684 (Ala.Cr.App. 1982). The appellant has not alleged or shown that any exculpatory material was suppressed, and he did not request further review by the trial court after the prosecutor reviewed the files related to the other murder case. Therefore, the trial court did not abuse its discretion in refusing to order discovery or to grant the request for an in camera inspection.
The appellant also argues that the trial court improperly denied his motion to depose the prosecution's expert witnesses. In denying the motion, the trial court ordered that the prosecution give the appellant a curriculum vita for each of its expert witnesses. (R. 112-13.) Moreover, the defense stated that it was already planning to interview each of the prosecution's experts before the trial, and suggested that the motion to depose be renewed if the experts did not cooperate during the interview. (R. 113-14.) The trial court agreed that, if the experts did not cooperate, it would reconsider the motion. The appellant never presented the motion to the trial court again. Because the trial court ordered production of the curriculum vita of each expert and agreed to reconsider the motion if necessary, we find no abuse of discretion in this regard.

D.
Fourth, the appellant argues that the trial court improperly denied his request for discovery that he contended would document the media coverage of the offense. The record shows that the appellant obtained several items that documented the media coverage of the offense. Furthermore, at a pretrial hearing, the trial court noted that the offense had occurred approximately 1  years before the hearing and that there had not been much publicity about the offense recently. Therefore, it denied the motion at the time and suggested that the appellant revisit the issue at the time of trial. Specifically, the trial court stated that it would reconsider the motion if the voir dire proceedings in the case indicated that the appellant would not be able to obtain an unbiased jury. As noted in Part XXIII of this opinion, the appellant did not show that a change of venue was necessary because of pretrial publicity. Therefore, the trial court did not abuse its discretion in denying the appellant's request.
Finally, the appellant argues that the cumulative effect of the trial court's allegedly erroneous denials was to "shut-down" his ability to defend himself. (Appellant's brief at p. 65.) However, because we have found each of the individual claims of error to be without merit, we also find this cumulative error argument to be without merit.

VIII.
The appellant's eighth argument is that the trial court erred in admitting his "No Fear" T-shirt into evidence. On the back of the "No Fear" T-shirt was the slogan, "YOU GONNA DO SOMETHIN OR ARE YOU GONNA JUST STAND THERE AND BLEED?" and simulated blood spatters. The appellant argues that the T-shirt was highly prejudicial, that it had no probative value, and that its admission into evidence violated his First Amendment Rights. Before trial, the appellant moved in limine to prevent the prosecutor from mentioning, referring to, or introducing the T-shirt. The trial court ordered that the T-shirt was admissible if the appellant was wearing it at the time of the offense, but it ordered the prosecutor not to comment on the words on the T-shirt. (R. 1417.) At no time did the prosecutor comment about the slogan on the T-shirt during *39 the guilt phase of the trial. Even though the trial court stated that it would allow the prosecutor to comment on the words on the T-shirt at the penalty phase, the prosecutor did not make any such comments.

A.
First, the appellant argues that the T-shirt should have been excluded under Rule 403, Ala. R. Evid., because it allegedly had little or no probative value and was highly prejudicial. Rule 403, Ala. R. Evid., provides that relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." (Emphasis added.) A determination of whether the probative value of evidence is substantially out-weighed by the danger of unfair prejudice rests within the sound discretion of the trial court. Hayes v. State, 717 So.2d 30 (Ala.Cr.App.1997). Although the appellant argues that the trial court did not understand Rule 403, Ala. R. Evid., and did not correctly weigh the potential probative value of the T-shirt against the possibility of undue prejudice, trial courts are "presumed to know the law and to follow it in making their decisions." Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997).
In Barbour v. State, 262 Ala. 297, 78 So.2d 328, 339 (1954), the Alabama Supreme Court held:
"`The clothing of the deceased, as well as that of the accused, are usually held admissible on trials of homicides. If tending to elucidate the transaction, to identify any of the parties, to connect the accused with the crime, or to show the character of the wound, motive or intent of the killing, or degree of the crime, whether the killing was in self-defense or not, they are admissible. If such objects tend to corroborate or disprove, illustrate or elucidate any other evidence, they are admissible, though such evidence may have a tendency to bias or prejudice the jury, to elicit their sympathy for, or animosity toward either the deceased or the accused. Rollings v. State, 160 Ala. 82, 49 So. 329; Whitaker v. State, 106 Ala. 30, 17 So. 456; Curtis v. State, 118 Ala. 125, 24 So. 111; McCormack v. State, 102 Ala. 156, 161, 15 So. 438; Gassenheimer v. State, 52 Ala. 313; Campbell v. State, 23 Ala. 44' Teague v. State, 245 Ala. 339, 341, 16 So.2d 877, 879; Floyd v. State, 245 Ala. 646, 647, 18 So.2d 392."
Barbour, 262 Ala. at 309, 78 So.2d at 339 (emphasis added). See also Williams v. State, 375 So.2d 1257, 1267 (Ala.Cr.App.), cert. denied, 375 So.2d 1271 (Ala.1979). The appellant admitted that he was wearing the "No Fear" T-shirt on the night of the murders and that the T-shirt had bloodstains on it. He also told police officers where they could find the T-shirt. Roger Morrison, the State's DNA expert, testified that one of the bloodstains on the T-shirt matched Barry Robinson's blood. He also testified that the tests excluded the appellant and Stacy Terry as the source of the blood. The bloodstained T-shirt was highly relevant because it connected the appellant to Barry Robinson's death and corroborated his statements to police. Furthermore, the T-shirt, when combined with other evidence presented at trial, was relevant to the charge that the murders occurred as part of one course of conduct. Because the T-shirt had an extremely high probative value, the danger of unfair prejudice arising from the jury's possible reaction to the slogan on the T-shirt did not substantially outweigh its probative value. Accordingly, the trial court did not abuse its discretion in admitting the T-shirt into evidence.
The appellant also argues that the prosecutor's use of the T-shirt during penalty-phase closing arguments prejudiced him. During his closing arguments, defense counsel asked the jury for mercy and focused on the abuse the appellant suffered as a child, his youth, his diminished capacity, his lack of a prior criminal *40 history, and his drug and alcohol addiction. In rebuttal, the prosecutor argued against mercy. The prosecutor focused on the victims and the series of events leading up to the murders. He stated that the appellant "went back in the house, and they are sitting there and he comes out from around the back of the trailer wearing this T-shirt and with this [gun] in his hand and sticks it up within just no distance of Stacy Terry's head and shoots him twice in the head. I don't know how long it was before Barry Robinson realized what was going on, but then at some point he sticks it in there and pumps two into his head." (R. 3305.) At the conclusion of the prosecutor's closing arguments, defense counsel moved for a mistrial, stating:
"During the course of his argument he said, `Wearing this T-shirt,' and he displayed it to the jury for 45 seconds maybe, but for a prolonged period of time displaying to the jury the back side of the T-shirt containing the language that is the subject to our challenge. That was the portion that we had sought to preclude in limine. The Court overruled us on that, but I wanted to clarify that was the part that indeed did manifest itself during the argument, and we move for a mistrial on that basis."
(R. 3310). "`The granting of a mistrial is an extreme measure and should be exercised only when manifestly necessary or when the ends of justice would otherwise be defeated.'" Grimsley v. State 678 So.2d 1197, 1206 (Ala.Cr.App.1996) (citations omitted). Although a trial court's ruling on a motion for a mistrial may be reviewed on appeal, it is "`within the discretion of the trial court; [it] will not be reversed in the absence of a clear abuse of discretion.'" Talley v. State, 687 So.2d 1261, 1276 (Ala.Cr.App.1996) (quoting Ex parte Jefferson, 473 So.2d 1110, 1114 (Ala. 1985), cert. denied, 479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 300 (1986)).
The record does not reflect the actual time the slogan on the T-shirt was visible to the jury. Furthermore, defense counsel did not argue that, and we are unable to conclude from the record whether, any of the writing on the T-shirt was legible to the jury. Finally, the prosecutor did not make any comment on the slogan itself. Thus, the trial court did not err in denying the appellant's motion for a mistrial.

B.
Next, the appellant argues that the admission of the slogan on the T-shirt violated his First Amendment rights. Because he did not present this specific argument to the trial court, we review it for plain error. Rule 45A, Ala. R.App. P. The First Amendment prevents a state from presenting evidence of a defendant's abstract beliefs and association with an "ill-received organization or group" when such evidence is irrelevant. Ex parte Davis, 718 So.2d 1166, 1177 (Ala.1998); Dawson v. Delaware, 503 U.S. 159, 168, 112 S.Ct. 1093, 1099, 117 L.Ed.2d 309 (1992). The appellant argues that the "No-Fear" T-shirt indicated that he associated himself with "self-styled societal outcasts with an `attitude,'" because this line of clothing is allegedly targeted to young males "who are inclined to resist authority and challenge societal norms." (Appellant's brief at p. 73.) The appellant bases this assertion on Sportmart, Inc. v. No Fear, Inc., [No. 94 C 4890, June 3, 1996] (N.D.Ill.1996) (unpublished), which referred to "No Fear" clothing as "`attitude' sportswear" and on No Fear, Inc. v. Big Ball Sports, 133 F.3d 928 (9th Cir.1998)(unpublished), which stated that "No Fear" products connote a "certain machismo." However, the court in Sportmart also stated that the slogans generally printed on "No Fear" products express "themes of courage, achievement and individuality." Sportmart, supra. Nothing in the slogan printed on the appellant's T-shirt showed any abstract beliefs he held or his association with any ill-received group. Accordingly, the prosecutor's use of the T-shirt at the penalty phase of the trial did not violate the appellant's First *41 Amendment rights, and there was no plain error on this ground.

IX.
The appellant's ninth argument is that the trial court erroneously admitted into evidence statements he made to Nashville police officers and to Alabama police officers. Specifically, he claims that the statements were made after inadequate Miranda warnings and were the product of police coercion. Confessions and inculpatory statements are presumed to be involuntary and inadmissible. Ex parte Callahan, 471 So.2d 463 (Ala.1985). For a confession to be properly admitted, the State must prove that "`the defendant was informed of his Miranda rights and that the confession was voluntarily given.'" Johnson v. State, 680 So.2d 1005, 1007 (Ala.Cr.App.1996) (quoting Mann v. State, 581 So.2d 22, 23 (Ala. Cr.App.1991)).
"`In determining whether a confession is voluntary, the trial court's finding of voluntariness need only be supported by a preponderance of the evidence. Seawright v. State, 479 So.2d 1362 (Ala.Crim.App.1985). The trial court's decision will not be disturbed on appeal unless it is manifestly contrary to the great weight of the evidence.'"
Howard v. State, 678 So.2d 302, 306 (Ala. Cr.App.1996) (quoting Dixon v. State, 588 So.2d 903, 907 (Ala.1991)).
"`"In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court."` Kennedy v. State, 640 So.2d 22, 26 (Ala.Cr.App.1993), quoting Bradley v. State, 494 So.2d 750, 761 (Ala.Cr. App.1985), aff'd, 494 So.2d 772 (Ala. 1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987). A trial court's ruling on a motion to suppress will not be disturbed unless it is `palpably contrary to the great weight of the evidence.' Parker v. State, 587 So.2d 1072, 1088 (Ala.Cr.App.1991)."
Rutledge v. State, 680 So.2d 997, 1002 (Ala. Cr.App.1996).
In McLeod v. State, 718 So.2d 727 (Ala. 1998), the Alabama Supreme Court explained the standard used to determine whether a confession was voluntarily given:
"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the `totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Cr.App. 1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is `whether the defendant's will was overborne at the time he confessed') (emphasis added)....
". . . .
"[T]he test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by `apprehension of harm *42 or hope of favor.' See Gaddy, 698 So.2d at 1154 (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala.1988)); Culombe, 367 U.S. at 602, 81 S.Ct. at 1879; Jackson, 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess `the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; `[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.' Jackson, 562 So.2d at 1380-81 (citations omitted)."
718 So.2d at 729-30.

A.
The appellant made two inculpatory oral statements to Officer Tim Mason of the Nashville Police Department shortly after he was arrested. He argues that those statements were involuntary and inadmissible because he was not fully advised of his Miranda rights, because Mason told him he "would" take a statement from him at the police station, because Mason interrogated him without allowing him to assert his right to remain silent, and because Mason coerced him into making the statements. At a hearing on the appellant's motion to suppress the statements, Officer Mason testified that, at the time of the appellant's arrest, he asked the appellant if he knew why he was being arrested and the appellant indicated that he did. (R. 420-21.) He then advised the appellant of his Miranda rights, and the appellant indicated that he understood those rights. (R. 421-22.) According to Mason, the appellant was coherent and did not appear to be under the influence of alcohol or drugs at the time of his arrest. Mason stated that he did not ask the appellant any questions at that time; rather, he told the appellant that they would talk later at the police station. When he arrived at the police station, Mason learned that police officers from Alabama would be interrogating the appellant. Shortly thereafter, the appellant indicated that he needed to use the restroom. As he was escorting the appellant to the restroom, Mason told the appellant that police officers from Alabama would be interviewing him later and that he would not be conducting the interview. At that time, the appellant spontaneously said, "Well, I did it." (R. 423, 2491.) Mason stated that the appellant then went into the restroom and did not say anything else.
Later, when the appellant told Mason he would like to smoke a cigarette, Mason escorted him outside to smoke. At that time, the appellant voluntarily and without prompting from Mason divulged more information about his involvement in the murders. (R. 424.) At trial, Mason testified that the appellant specifically told him that he had shot and killed two people in a car and that the gun he used to commit the murders was in a safe place. (R. 2492-93.) While cross-examining Mason, defense counsel elicited testimony about a conversation during which the appellant had asked him if he knew what had happened and he responded that he was curious about the case. (R. 2497.) Mason stated that, although he told the appellant he was curious about the case, he informed the appellant that he did not have to talk to him about the case. (R. 2502-03.) He admitted during cross-examination that he had commented to another officer about the location of the murder weapon and that the appellant may have overheard the comment; however, he stated that he had not made the statement to get the appellant to disclose the location of the gun. (R. 2498-99.) The appellant did not offer any testimony at the suppression hearing.
"`"If a defendant spontaneously volunteers information, either before or after being given the Miranda warnings, those statements need not be suppressed." United States v. Edwards, 885 F.2d 377, 387 (7th Cir.1989). See also Crawford v. State, 479 So.2d 1349, 1352 (Ala.Cr.App.1985) ("An unsolicited *43 remark, not in response to any interrogation, does not fall within the Miranda rule"); United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir.[1992]) ("The protections afforded a suspect under [Miranda] apply only when the suspect is both in custody and being interrogated. A voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of Miranda warnings."), cert. denied, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 434 (1992).
"`"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.... Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the holding in Miranda]."

"`Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). See also Britton v. State, 631 So.2d 1073, 1078 (Ala.Cr.App.1993); Williams v. State, 601 So.2d 1062, 1072 (Ala.Cr.App.1991).'"
Ex parte Clark, 728 So.2d 1126, 1132 (Ala. 1998) (quoting Worthington v. State, 652 So.2d 790, 792-93 (Ala.Cr.App.1994)).
The appellant's arguments that he did not voluntarily make the statements to Officer Mason are without merit. Mason testified that he advised the appellant of his Miranda rights, including his right to stop answering questions at any time during the interview. (R. 421, 2476-77, 2495) He also testified that the appellant confessed to the murders within an hour after he had been Mirandized and transported to the Nashville Police Department. (R. 423.) Clearly, the appellant had been advised of his constitutional rights and had had ample time to invoke those rights before he made the incriminating statements to Mason.
The appellant's arguments that his statements were involuntary because of Mason's comments regarding his curiosity about the case and the whereabouts of the murder weapon are likewise without merit. The appellant did not make his statements to Mason during any interrogation or because of any police coercion. "[I]n the absence of `compelling influences, psychological ploys, or direct questioning,' the `possibility' that an accused will incriminate himself, even the subjective `hope' on the part of the police that he will do so, is not the functional equivalent of interrogation." Burgess v. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___ (Ala. Cr.App.1998) (citing Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987)). We do not find that Officer Mason's comments about his curiosity concerning the case and the whereabouts of the gun were intended to prompt an incriminating response from the appellant. Rather, the appellant was engaged in a "custodial conversation" with Mason, as opposed to a "custodial interrogation," when he volunteered information to Mason concerning his involvement in the murders. Further, the evidence showed that the appellant initiated the conversations with Mason regarding his involvement in the murders. Although the appellant was in custody when he made the incriminating statements to Mason, he had been fully advised of his Miranda rights and he volunteered the information to Mason. Based on the totality of the circumstances in this case, we conclude that the evidence supports the trial court's determination that the appellant's statements to Mason were voluntary and admissible.

B.
The appellant also argues that his videotaped statement to Officer Howard Battles, an investigator from Morgan County, was involuntary and inadmissible *44 because he was not adequately informed of his Miranda rights before the interview. More specifically, he argues that he was not advised that he could revoke his waiver and stop answering questions at any time during the interview and that he had the right to be represented by counsel. Additionally, he argues that his statement was involuntary because he was interrogated for nearly three hours, beginning at approximately 3:20 a.m., and because he lacked experience with the criminal justice system.
During a suppression hearing, the appellant argued that his statement was not admissible because he was never informed, before the interview, that he faced the death penalty based on the charges against him. The appellant did not assert the grounds for inadmissibility at trial that he now argues on appeal. Therefore, we review this issue for plain error. Rule 45A, Ala. R.App. P.
The appellant's claim that he was not fully advised of his Miranda rights prior to making the videotaped statement is without merit. State's Exhibit 232, a "Rights Waiver" form, clearly indicates that the appellant was advised of his constitutional rights and that he voluntarily and knowingly waived those rights. The form contains a section entitled "Your Rights" and a section entitled "Waiver of Rights." The form specifically reflects that the appellant was informed of 1) his right to remain silent; 2) his "right to a lawyer for advice before we ask you any questions and to have the lawyer with you during questioning"; and 3) his right to have a lawyer, before questioning, free of cost if he could not afford to hire one. Under the "Waiver of Rights" heading, which was followed by the appellant's signature, the form clearly stated that the appellant understood that he was waiving his rights; that he did not want a lawyer; that he had not been pressured or coerced into submitting to questions; and that he understood that he could stop answering questions at any time and the interview would stop.
Officer Battles testified at the suppression hearing and at trial (and the videotape shows) that he advised the appellant of his constitutional rights before the interview. (R. 2648, 2705.) He further testified that the appellant was coherent and was not intoxicated at the time of the interview. (R. 2645.) He stated that, before the interview, the appellant signed a form indicating that he understood his rights and that he was voluntarily and knowingly waiving those rights. (R. 2648-49.) After hearing Officer Battles's testimony and considering the evidence, the trial court found that the appellant was properly advised of his rights and admitted the videotaped confession into evidence. The evidence supports the trial court's finding that the appellant was fully advised of his Miranda rights.
The appellant further argues that his videotaped statement was involuntary because his will allegedly was overborne because the interview was conducted at 3:20 a.m. and lasted for three hours and because he lacked experience with the criminal justice system. After thoroughly reviewing the evidence in this case, including the videotaped confession and the written statement of that confession, we do not find that the appellant's will was overborne when he confessed to Officer Battles. Rather, the evidence shows that the appellant was advised of his constitutional rights and that he voluntarily waived those rights and spoke to Officer Battles. He was 21 years old at the time of the offense and he had an eleventh-grade education. Further, the appellant signed a waiver-of-rights form in which he clearly indicated that he had not been pressured or coerced into making the statement to the Alabama police officers. Moreover, his demeanor during the confession, as evidenced by the videotape, reflected that he was coherent and fully understood what he was doing. The evidence does not show that any of the officers physically intimidated or psychologically *45 pressured the appellant or used any "strong-arm" tactics to coerce him to confess. There is no evidence that the interrogation lasted for an unreasonable period of time or that the early morning hours affected the appellant's willingness to cooperate with the police officers. Thus, there is absolutely no evidence that his will was overborne by the conduct of the police officers. Based on this evidence, the State satisfied its burden of proving that the appellant made his statement voluntarily. Therefore, the trial court properly admitted the statement into evidence.

X.
The appellant's tenth argument is that the trial court erred when it referred to evidence that had not been presented to the jury. Because he did not object at trial to any of the comments about which he now complains, we review this issue for plain error. Rule 45A, Ala. R.App. P.
"Alabama law precludes a prosecutor from intimating to the jury that there is other evidence he would have introduced were it not for evidentiary rules. Ex parte Washington, 507 So.2d 1360 (Ala. 1986). However, case law is silent as to whether the trial court, in its instructions to the jury, can mention that there is evidence the jury has not heard. In a noncapital case, this court has held, `Each case of allegedly improper remarks by a trial judge must be judged on its own peculiar facts.' Dooley v. State, 575 So.2d 1191, 1194 (Ala.Crim. App.1990); McNeely v. State, 524 So.2d 375 (Ala.Crim.App.1986), (quoting Oglen v. State, 440 So.2d 1172, 1175-76 (Ala. Crim.App.), cert. denied, 440 So.2d 1177 (Ala.1983)). `While a particular remark by the trial judge may be open to question, in order for it to amount to grossly improper error requiring reversal, it must have influenced the result of the case.' Thompson v. State, 503 So.2d 871, 879 (Ala.Crim.App.1986), aff'd, 503 So.2d 887 (Ala.1987), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155, reh'g denied, 484 U.S. 971, 108 S.Ct. 471, 98 L.Ed.2d 410."
Slaton v. State, 680 So.2d 879, 886 (Ala.Cr. App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997).
During its initial instructions to the jury, the trial court stated:
"There are documents and tapes that may be offered. I don't know yet. I haven't ruled on the admissibility of all that yet, but there are a number of documents that may be offered into evidence that you will be able to consider when you get the case. You will see them in court and you will also be able to have those with you in the jury room."
(R. 1444.) The trial court's comment was merely part of its explanation about the order of the proceedings, and the trial court did not state that any evidence had been excluded. Furthermore, the trial court emphasized, "The evidence will come from this witness stand and will come from the documents or the pieces of paper or whatever physical evidence there is that is offered into evidence and admitted into evidence in this case." (R. 1445-46.)
The second instance occurred before the trial court conducted a hearing on the admissibility of the State's DNA evidence and the voluntariness of the appellant's statements. At that point, the trial court informed the jury:
"Okay. Ladies and gentlemen, we're going to break for the day as far as the jury is concerned. I've got at least an hour's worth or maybe longer of testimony that I have toâ the law says I have to review it before it can be offered to the jury; so I'm going to do that this afternoon so that hopefully in the morning at 9:00 o'clock we'll be ready to go. You will get to hear the testimony that I hear this afternoon if it's admitted. If not, we'll go on to the next phase of the *46 case, but I'll have to make that determination this afternoon so I'm not going to make you wait in the jury lounge. I'm going to let you go back to the motel and call it a day as far as the testimony that you're going to hear today."
(R. 2554-55) (emphasis added). The appellant concedes that the trial judge actually admitted the evidence referred to in the excerpt. The following morning, Roger Morrison, the State's DNA expert, testified, and the State introduced the appellant's videotaped statement into evidence. After Howard Battles testified briefly concerning the statement, the State rested its case. The appellant argues that the trial court's statements made the jury aware that the trial court was screening the evidence. It is the trial judge's duty to determine the admissibility of evidence offered at trial. "The trial judge is more than a mere moderator, and it is his duty to conduct an orderly and fair trial." Clements v. State, 521 So.2d 1378, 1381 (Ala.Cr. App.1988). Furthermore, it would have been apparent to the jury that the trial judge was screening the evidence presented as he ruled on the appellant's objections to evidence and presided over the sidebar conferences.
The final instances about which the appellant complains occurred while the jury was watching the appellant's videotaped statement to police. During a break in the showing of the appellant's videotaped statement, the following occurred:
"The Court: Then once we put the second tape in, we will have about a minute's worth of testimony before we need to make an alteration, is that right?
"[Prosecutor]: Yes, sir.
"The Court: We will take a break then in about an hour and then we will play the second segment which is about 15 minutes or so. Are we ready?"
(R. 2710-11.) Subsequently, during another pause in the proceedings, the trial court stated, "I believe you all informed me during the recess that there is one other segment of an unrelated matter we're going to freeze where we are and turn the T.V. around and fast forward it to the next part." (R. 2713) (emphasis added). However, the trial court had previously informed the jury, before beginning the second tape, as follows:
"We're going to watch a minute or two of tape number two, which is State's Exhibit 231. The lawyers on both sides have agreed that a portion of that tape is not relevant to this hearing; so what we're going to do, I haven't seen it and I don't know what it is, but the lawyers on both sides have agreed that it cannot be shown and actually should not be shown, so we're going to watch the first portion of this tape and then take a break and we'll let Investigator Bartlett set that up or fast forward it to the point he needs to during the break, then we'll come back and watch the remaining 15 minutes or so of it."
(R. 2711) (emphasis added). The trial court emphasized that both the State and the appellant agreed that part of the tape was irrelevant. Furthermore, the trial court merely explained the process of viewing the tape. It would have been apparent, after the tape was stopped, the television turned around, and the tape resumed at a different point, that the jury was not seeing the confession in its entirety.
All of the instances about which the appellant complains occurred as the trial court attempted to keep the jury informed about what was happening during the various stages of trial. The only time the trial court actually informed the jury that there was evidence it would not hear was during the videotaped statement. Even then, the trial court did not imply that the evidence would show the appellant's guilt. Rather, the trial court emphasized that the omitted portion of the statement was irrelevant. The appellant's videotaped and written statements to police, in which he admitted killing Terry and Robinson and stealing Terry's automobile, were admitted into evidence. The State also presented DNA *47 evidence that linked the appellant to both murders. "We find it hard to imagine that the jury would believe something even more prejudicial was being held from them." Slaton, 680 So.2d at 886. Furthermore, the trial court instructed the jury as follows:
"During the course of this trial you heard the Court rule on various items of evidence. I will remind you that you are to disregard all evidence and all statements, assertions, acts or otherwise that may have been mentioned or brought forth before the Court which were ruled not to be competent or legal evidence before you."
(R. 2978-79.) Because the trial court's statements, when viewed under the facts of this case, were not such as to influence the result of the case, they did not constitute plain error.

XI.
The appellant's eleventh argument is that the State did not satisfy its burden of proving the admissibility of DNA evidence. Specifically, he contends that the State did not satisfy the requirements of Ex parte Perry, supra, during the admissibility hearing. Therefore, he argues that the trial court erred in admitting testimony by the State's DNA expert into evidence.
At the time of the appellant's trial, § 36-18-30, Ala.Code 1975, not Perry, governed the admissibility of DNA evidence. That section provides:
"Expert testimony or evidence relating to the use of genetic markers contained in or derived from DNA for identification purposes shall be admissible and accepted as evidence in all cases arising in all courts of this state, provided, however, the trial court shall be satisfied that the expert testimony or evidence meets the criteria for admissibility as set forth by the United States Supreme Court in Daubert, et. ux., et. al., v. Merrell Dow Pharmaceuticals, Inc., decided on June 28, 1993."
For DNA evidence to be admissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-95, 113 S.Ct. 2786, 2795-97, 125 L.Ed.2d 469 (1993), it must be reliable and relevant. Some factors that are germane in determining whether evidence is reliable include testimony 1) that the technique has been tested, 2) that the technique has been subjected to peer review and publication, 3) about the known or potential rate of error and quality controls associated with the technique, and 4) that the technique is generally accepted in the relevant scientific community. Daubert, 509 U.S. at 593-94, 113 S.Ct. at 2796-97. In assessing reliability, the trial court should focus on the principles and methodology underlying the technique, not the conclusions they generate. Daubert, 509 U.S. at 594-95, 113 S.Ct. at 2797. In determining whether DNA evidence is relevant, the trial court should decide whether the evidence will help the factfinders understand the evidence or decide a fact that is in issue. Daubert, 509 U.S. at 591, 113 S.Ct. at 2795. Thus, to be admissible, the DNA evidence must relate to some issue in the case.
In this case, the State presented sufficient evidence from which the trial court could determine that the DNA evidence satisfied the admissibility requirements of Daubert. Roger Morrison, a forensic scientist employed by the Alabama Department of Forensic Sciences in its Huntsville laboratory, testified for the State as an expert in the field of DNA analysis. (R. 2571.) He testified about both polymerase chain reaction (PCR) matching and population frequency statistics.
Morrison testified that, using the PCR method of DNA testing, scientists target certain small segments of DNA and replicate or duplicate those segments in the lab. As a result, they can perform tests on very minute amounts of a sample or very highly degraded samples. (R. 2575-76.) In utilizing the PCR method, a sample is collected, the DNA is extracted, and *48 many kinds of proteins and enzymes are removed from the sample. (R. 2576.) After the sample is "cleaned," the duplication process begins. (R. 2576.) The PCR method involves amplifying small amounts of DNA into sufficient quantities so tests can be performed. (R. 2576-77.) Once the sample has been duplicated, a gel is run to assure that the amplification process is performed in the manner expected, that the amplified product is present, and that the amplified product is in the molecular weight range for the genetic markers they are interested in. (R. 2577.)
Morrison testified that PCR technology is widely accepted and heavily used. (R. 2579.) In fact, he testified that these same procedures are used in laboratories throughout the world. (R. 2578.) In addition to the field of forensics, he testified that the procedures are used in many other fields throughout the scientific community. (R. 2578-79.) He described the PCR method as an evolving technology, explaining that the theory had been known for quite some time but that the mechanisms for doing it in a laboratory had been worked out in the mid-1980s. (R. 2580.) Once the technology became available, all scientific fields began to use it. (R. 2580.)
Morrison also testified that the PCR method has been subjected to peer review and publication. (R. 2581-83.) Several scientific journals and peer review journals have discussed the specific genetic markers his laboratory uses and have discussed their validity in the scientific community in general and the forensic community in particular. (R. 2581.) He specifically discussed a 1992 study that investigated the use of DNA testing in courtrooms and that validated the use of DNA testing for such purposes. (R. 2581-82.) He testified that the study showed that, if done accurately, the PCR method would produce accurate results. (R. 2582-83.)
Some of the standard quality controls include using reagent blanks (R. 2583), amplification blanks (R. 2584), and known DNA samples to detect any contamination (R. 2584). They also use several internal controls to make sure the equipment is working properly both on the particular samples tested and in general. (R. 2584-85.) When testing unknown samples, they duplicate the procedure on the samples to make sure they get the same results every time. (R. 2585.) They perform an analysis to show that they recovered human DNA, and they do an amplification or product gel after amplification to assure that they have amplified the product at the correct molecular weight range. (R. 2585.) As the samples are being typed, a second individual examines them at the same time. Both individuals must come to an agreement on the type of sample, and they record the results independently. (R. 2586.) When the report is written, another individual reviews all of the data and the report to verify that the report accurately reflects the data that has been generated. (R. 2586.)
Morrison further testified about other outside controls that test the procedures his laboratory uses and the individuals performing the procedures. (R. 2587.) The genetic systems the laboratory uses are validated in that laboratory, in the Birmingham laboratory, and by many other laboratories throughout the United States. (R. 2587.) They also subject each of the individuals who do the work to proficiency testing at least two times per year. (R. 2587.) To do the proficiency testing, the laboratory subscribes to a national service whereby an agency sends them unknown samples and they perform the testing, prepare a report, and submit the report to the service agency. (R. 2588.) In addition to checking the individual samples for accuracy, the service agency also checks on a nationwide basis to assure that all of the systems are performing as expected and that the individuals who are performing the tests are doing them correctly. (R. 2588.) Finally, he testified that neither he nor his laboratory has had any proficiency problems in performing the tests. (R. 2588.)
*49 Much of Morrison's testimony about the PCR method and its testing, peer review, rate of error and quality controls, and general acceptance in the scientific community also applied to population frequency statistics. In addition to his previous testimony, Morrison also testified as follows concerning DNA population frequency statistics. (R. 2589.) He explained that the frequencies or statistics place a level of significance on the PCR results by giving a frequency within which some individual in the population, other than the one tested, could have the same set of genetic markers or DNA profile. (R. 2589.) He testified that the procedure is reliable because the testing works with discreet alleles. (R. 2590.) When working with discreet alleles, the process for determining frequency involves a simple counting process. (R. 2590.) Applying the process, the scientist first determines how often a specific allele occurs within a sampling of the population. (R. 2590-91.) From that, he determines how often the allele occurs within the population group. (R. 2591.) Finally, he applies the two previous determinations to calculate how often the allele occurs in the general population as a whole. (R. 2591.) Morrison explained that the process involves a simple multiplication calculation that is commonly used in other biological sciences. (R. 2591.) He testified that the population frequency statistics are reflections of the particular DNA markers examined and the number of markers examined. (R. 2624.) In this case, his laboratory used seven markers. (R. 2625.) He testified that the numbers become more precise with each additional marker used, and that increasing the number of markers used increases the probability of zeroing in on one particular individual as the source of the DNA. (R. 2626.)
Morrison explained that the database his laboratory uses is generated in the Birmingham laboratory from data collected from 100 Caucasian and 100 black individuals. (R. 2591-92.) He testified that those numbers are considered sufficient to yield an accurate result. (R. 2592.) Regarding controls, he testified that, in addition to the controls already mentioned, the results are verified by other individuals in the laboratory. (R. 2592.) Also, the database has been checked for accuracy by population geneticists. (R. 2592-93.)
Morrison also testified that the population frequency technique has been tested and is generally accepted in the scientific community as one that can be performed with a general degree of reliability. (R. 2590.) He testified that the 1992 study he previously mentioned also tested the validity of statistical methods and validated them. (R. 2582-83.) Specifically, he testified that the study validated the methods for determining the statistical significance of the PCR results. (R. 2581-82.) He also explained that a 1996 publication corrected some errors made in the 1992 study and further expanded on the validity of DNA testing within the forensic community. (R. 2582.)
Morrison's testimony established that both the PCR method and the procedures for determining population frequency statistics had been tested, had been subjected to peer review and publication, had a known rate of error and adequate quality controls, and were generally accepted in the scientific community. Thus, the State presented sufficient evidence from which the trial court could have determined that the PCR method and the resulting population frequency statistics were reliable. Furthermore, the DNA evidence was relevant to establishing the appellant's identity as the perpetrator of the murders, to corroborating the appellant's statements to police, and to supporting the State's theory that the two murders were part of the same course of conduct. Therefore, because the State established both the reliability and relevance of the evidence, as required by § 36-18-30, Ala. Code 1975, the trial court properly admitted the DNA evidence at trial.

*50 XII.
The appellant's twelfth argument is that the jury was improperly briefed on his case outside of his or his counsel's presence. Because he did not present this claim to the trial court, we review it for plain error. Rule 45A, Ala. R.App. P.
As best we can discern from the record before us, it appears that Judge Sherrie Brown, who was not the trial judge in this case, presided over the organization of the entire jury venire for the week. A few comments during the appellant's trial proceedings indicate that, while organizing the jurors, Judge Brown may have told them that the trial of the appellant's case could last as long as two or three weeks. The appellant asks us to reverse his conviction because of additional comments Judge Brown may have made to the jurors. However, there is absolutely no indication in the record that Judge Brown gave the jurors any other information about the appellant's case. We will not predicate error on a silent record. Foster v. State, 587 So.2d 1106 (Ala.Cr. App.), opinion extended after remand, 591 So.2d 151 (Ala.Cr.App.1991). Rather, "`"[w]here the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done."`" Spangler v. State, 711 So.2d 1125, 1130 (Ala.Cr.App.1997), cert. denied, 525 U.S. 1044, 119 S.Ct. 597, 142 L.Ed.2d 539 (1998) (quoting Owens v. State, 597 So.2d 734, 736 (Ala.Cr.App. 1992)). Finally, trial judges are presumed to know the law and to follow it. Ex parte Slaton, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997); Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Therefore, we find no error in this regard.
The appellant also argues that he had a right to be present when Judge Brown organized the jurors for the week. Rule 9.1(a), Ala. R.Crim. P., provides that a defendant has the right to be present "at arraignment and at every stage of the trial, including the selection of the jury, the giving of additional instructions pursuant to Rule 21, the return of the verdict, and sentencing." It does not include the general organizational meeting of the potential jurors for the week. Therefore, the appellant's claim is without merit.

XIII.
The appellant's thirteenth argument is that the trial court improperly "blocked exploration of possible discrimination in the selection of the venire" and prevented him from discovering biases among potential jurors. (Appellant's brief at p. 90.)

A.
First, the appellant reasserts his argument that the trial court improperly denied his request for funds to hire an expert to help prepare and present his claims concerning discrimination in the formation of the grand and petit juries. For our discussion of this contention, see Part VII of this opinion.

B.
Second, the appellant argues that the trial court improperly denied his motion to require the prosecution to disclose any information concerning prospective jurors that might be favorable to him. He specifically requested discovery of Brady information; exculpatory evidence; any information the prosecutor knew about prospective jurors' beliefs that would be favorable or unfavorable to the defense; and information about relationships between members of the prosecuting team and prospective jurors.
As we have already mentioned, the trial court had previously ordered the prosecution to produce all Brady material and any exculpatory evidence to the defense. Therefore, the appellant's request for such information was unnecessary. With regard to the jurors' views or beliefs, the trial court noted that the defense should be able to obtain the requested information *51 during voir dire examination. (R. 96-97.) Finally, although it denied the appellant's written motion, the trial court instructed the prosecutor that if he or any of his staff members involved in the voir dire process became aware, during the voir dire examination, of any misrepresentation or omission concerning relationships between members of the prosecuting team and prospective jurors that would be tantamount to a misrepresentation, they would be obligated to make that information known to defense counsel. (R. 100-01.) The prosecutor acknowledged that he intended to comply with the trial court's order. We do not find that the trial court's ruling on this motion was erroneous. Therefore, the appellant's argument is without merit.

C.
Third, the appellant argues that the trial court improperly denied his motion that the trial court use a jury questionnaire. In denying the motion, the trial judge stated his concern that the confusion and problems caused by using a jury questionnaire outweighed the benefits of its use. (R. 191-92.) Some of the negative aspects of using a jury questionnaire that were discussed during the hearing on the motion included not being able to observe the demeanor of the jurors as they answered the questions, taking additional time to answer inquiries about questions the jurors might not understand, the risk of jurors becoming confused, and the time it would take to review the questionnaires. At that hearing, the defense admitted that it could obtain the same information through voir dire examination. (R. 188.) Furthermore, trial courts are not required to allow the use of jury questionnaires, even in capital cases. The Alabama Supreme Court addressed this issue in Ex parte Land, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996), as follows:
"Land also argues that the trial court's refusal to allow the use of a jury questionnaire form or individual voir dire prevented him from selecting a fair and impartial jury and, thus, violated his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and rights guaranteed by Alabama law. He contends that the use of a jury questionnaire, or individual voir dire examination of prospective jurors, was required in order for him to be able to conduct an effective voir dire designed to detect bias arising from pretrial publicity, without contaminating the entire venire....
". . . .
"A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Lane v. State, 644 So.2d 1318 (Ala.Cr.App.1994); Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), affirmed, 632 So.2d 543 (Ala.1993), affirmed, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). After reviewing the record, we conclude that the trial court did not abuse its discretion in this regard."
678 So.2d at 241-42; see also Siebert v. State, 562 So.2d 586 (Ala.Cr.App.1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990). Accordingly, the trial court did not err in denying the appellant's motion for a jury questionnaire.[3]

D.
Fourth, the appellant argues that the trial court improperly denied his motion for fully sequestered individual voir dire examination of jurors.

*52 "A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Lane v. State, 644 So.2d 1318 (Ala.Cr.App.1994); Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), affirmed, 632 So.2d 543 (Ala.1993), affirmed, [513] U.S. [504], 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). After reviewing the record, we conclude that the trial court did not abuse its discretion in this regard."
Ex parte Land, 678 So.2d at 242. Furthermore, we addressed a similar claim in Haney v. State, 603 So.2d 368 (Ala.Cr.App. 1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993):
"Appellant contends that the trial court erred in failing to grant individually sequestered voir dire of the jury venire. The trial court did permit individual voir dire in several instances but otherwise the jurors were questioned by panels. As a general rule, the decision whether to voir dire prospective jurors individually or collectively is within the sound discretion of the trial court. Waldrop v. State, 462 So.2d 1021 (Ala.Cr. App.1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618 (1988[1985]). This discretion is limited, however, by the requirements of due process. United States v. Hawkins, 658 F.2d 279 (5th Cir.1981); Waldrop v. State. Individual questioning may be necessary under some circumstances to ensure that all prejudice has been exposed. United States v. Hurley, 746 F.2d 725 (11th Cir.1984). We have reviewed the record of the voir dire examinations and the entire jury selection procedure in this case and find that the method of empaneling the jury provided reasonable assurance that prejudice would have been discovered if present. We find no abuse of discretion in the trial court's handling of the empaneling of this jury."
603 So.2d at 402. "Even in capital cases, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination." Hallford v. State, 548 So.2d 526, 538 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). See also Taylor v. State, 666 So.2d 36 (Ala.Cr.App.), opinion extended after remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
We have reviewed the transcript of the voir dire proceedings, and we are satisfied that the method of the examination and the empaneling of the jury "provided reasonable assurance that prejudice would have been discovered if present." Haney, supra. The trial court found that individually sequestered voir dire examination would be too time consuming, but it assured the defense that it would try to create an atmosphere in which jurors would feel free to be open and honest in answering questions. (R. 133-34.) The trial court divided the venire into four panels of fifteen members each, and it allowed both the prosecution and defense to use all of the time they wanted to use during voir dire examination. In fact, both the prosecution and defense conducted extensive voir dire examination. Furthermore, individual questioning was allowed if needed. There is no indication that the appellant was prejudiced by the trial court conducting voir dire examination of prospective jurors in panels rather than individually. Therefore, the trial court did not err in denying the appellant's motion for individually sequestered voir dire examination.

XIV.
The appellant's fourteenth argument is that the State did not establish a proper chain of custody for Stacy Terry's *53 automobile. Specifically, he alleges that Glen Brown, who received the automobile from Sheriff Crabbe of the Morgan County Sheriffs Department, did not testify at trial. Therefore, he argues that the trial court improperly admitted the automobile and several items of evidence collected therefrom into evidence. Because the appellant did not object on these grounds at trial, we review this issue for plain error. Rule 45A, Ala. R.App. P.
Morris Glen Brown, a scientist at the Huntsville division of the Alabama Department of Forensic Sciences, testified that, on August 2, 1995, he received a 1994 Chevrolet Camaro Z-28 automobile with a University of Alabama license plate with the word "TWINK" on it. (R. 2167.) Brown testified as to the manner of safekeeping and inspecting the automobile. He also testified that he turned cuttings from the automobile over to Roger Morrison, the State's DNA expert, for testing. Finally, he testified that he returned the cuttings to Howard Battles on the day he testified. Thus, the appellant's argument is without merit, and there was no plain error in this regard.

XV.
The appellant's fifteenth argument is that the record on appeal is not sufficient to permit full appellate review. Part of the record about which the appellant complains has since been supplied through a supplemental record. And, at this court's request, the remaining items have also been supplied to this court. Therefore, the appellant's argument is moot.

XVI.
The appellant's sixteenth argument is that prosecutorial misconduct deprived him of a fair trial and an accurate sentence determination. Throughout the trial, the trial court repeatedly instructed the jury that statements made by the attorneys were not evidence, that the jury was required to base its decision upon the evidence presented during the proceedings, and that the jury was not to base its decision on passion, prejudice, or any other arbitrary factor. We presume that the jury followed the trial court's instructions. Taylor v. State, 666 So.2d 36 (Ala.Cr.App.), opinion extended after remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). Also, we evaluate the comments made by the prosecutor in the context of the entire proceeding, not in isolation. Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). In judging a prosecutor's closing argument, the standard is whether the argument "`so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).
"In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App. 1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App. 1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982)."
Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Cr.App.1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala.1991), rev'd on *54 other grounds, 625 So.2d 1146 (Ala.1993). Finally,
"`[d]uring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100 (Ala. Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). `In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,' Hooks v. State, 534 So.2d 329, 354 (Ala. Cr.App.1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr. App.1990), aff'd, 590 So.2d 369 (Ala. 1991). `In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). `To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr. App.1985) (citations omitted)."
Coral v. State, 628 So.2d 954, 985 (Ala.Cr. App.), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994).

A.
The appellant argues that he was prejudiced by a number of allegedly improper comments the prosecutor made during the penalty phase of the trial. He claims that the prosecutor improperly commented on the evidence of mitigating circumstances and essentially told the jury to disregard all mitigating factors. According to the appellant, the prosecutor told the jury not to consider his age, voluntary intoxication, or mental impairment as mitigating factors. After thoroughly reviewing the prosecutor's closing and rebuttal arguments, we find that the prosecutor's comments regarding the mitigating evidence of age, voluntary intoxication, and mental impairment were made in response to defense counsel's argument that the jury should consider the appellant's youthful age and the fact that the appellant, according to the psychologist's testimony, suffered from diminished capacity, resulting from his consumption of alcohol and drugs at the time of the murders, as mitigating circumstances. Pursuant to § 135-45(g), Ala.Code 1975, the State has the burden of refuting mitigating circumstances offered by the defense. A prosecutor has a right to argue the weight of the evidence presented and to impeach the defense's evidence. Taylor v. State, 666 So.2d 36, 65 (Ala.Cr.App.), opinion extended after remand, 666 So.2d 71 (Ala.Cr.App. 1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). Further, a prosecutor may legitimately argue that intoxication should not be considered a mitigating circumstance. Arthur v. State, 711 So.2d 1031 (Ala.Cr.App.1996), aff'd, 711 So.2d 1097 (Ala.1997); Bankhead v. State, 585 So.2d at 108. Therefore, the prosecutor's comments regarding the defense's evidence of mitigating circumstances were not improper. Moreover, the trial court thoroughly instructed the jury to consider the appellant's age, past alcohol and drug use, and mental impairment as mitigating circumstances and to weigh all of the mitigating circumstances against the aggravating circumstances. (R. 3321, 3326-30.) We presume that the jury followed the instructions given by the trial court. Taylor v. State, 666 So.2d at 70.
The appellant also claims that the prosecutor improperly commented on *55 the fact that defense counsel did not call witnesses to corroborate the mitigating evidence that the appellant had assisted Decatur police officers in apprehending drug dealers. During the penalty phase, the appellant's stepmother testified that the appellant had assisted Decatur police officers in arresting drug dealers and that, as a result, various drug dealers had threatened him. Defense counsel asked the jury to consider the appellant's participation in apprehending dealers as a mitigating factor. During rebuttal, the prosecutor argued that if the appellant had helped the police officers arrest drug dealers, then defense counsel would have presented testimony from the officers to that effect. Although generally a party may not comment on the other party's failure to call a witness who is available to both sides, we do not find that the prosecutor's comment in this instance was improper. Because defense counsel offered evidence of the appellant's involvement with Decatur police officers in arresting drug dealers, the prosecutor had a right to attempt to disprove the existence of the mitigating circumstance under § 13A-5-45(g), Ala.Code 1975. Moreover, the prosecutor could legitimately comment on the defense's evidence. Stewart v. State, 601 So.2d 491, 506 (Ala.Cr.App.), opinion extended after remand, 659 So.2d 120 (Ala.Cr.App.1992), rev'd on other grounds, 659 So.2d 122 (Ala. 1993).
Additionally, the appellant argues that the prosecutor improperly told the jury to consider the "violent nature" of the murders as an aggravating circumstance. He argues that, because § 13A-5-49(8), Ala.Code 1975, was not an aggravating circumstance in this case, the prosecutor should not have commented on the violent nature of the crimes. Although the prosecutor did urge the jury to consider the violent nature of the murders, the appellant was not prejudiced by this remark. The trial court instructed the jury that the only aggravating circumstance it was to consider in this case was that the capital offense was committed while the appellant was engaged in the commission of a robbery. (R. 3323, 3331.) It further instructed the jury that the State had to prove the aggravating circumstance beyond a reasonable doubt, and the jury was to consider evidence relating only to the one aggravating factor it had been instructed by the court to consider. We presume that the jury followed the trial court's instructions. Taylor, 666 So.2d at 70. Therefore, we find no error in this regard.
The appellant argues that the prosecutor improperly told the jury that the mitigating circumstances would never outweigh the aggravating circumstances. However, the trial court repeatedly instructed the jury that comments by the attorneys were not evidence and that it would be instructing the jury on the law. Further, the trial court explained to the jury in great detail the process of weighing the mitigating circumstances against the aggravating circumstances and instructed the jury that it was to consider evidence of both mitigating and aggravating circumstances in making its recommendation. Again, we presume that the jury followed the trial court's instructions in this regard. Taylor, 666 So.2d at 70.
The appellant also claims that the prosecutor improperly commented on his courtroom demeanor and urged the jury to sentence him to death "because of his pedestrian mein." (Appellant's brief at p. 101.) He further argues that "the State's argument indicates that [his] courtroom demeanor was a mere stratagem designed to deceive the jury, that he truly deserves death, and the jury should not be fooled into returning a life verdict because he appears ordinary and has not been disruptive throughout the trial." (Appellant's brief at p. 101.) Finally, he contends that the comments on his demeanor further increased the likelihood that the jury would draw an adverse inference from his decision not to testify. During closing arguments, defense counsel argued that the appellant was different from others *56 accused of capital murder and did not deserve the death penalty because he had no criminal history and had never been imprisoned. (R. 3264.) He further argued that, because the appellant was only 21 years old and had longer to live than a 45-year-old convicted of capital murder and facing death, spending the rest of his life in prison would be a harsh enough punishment. During rebuttal, the prosecutor responded to defense counsel's argument, arguing that capital murder defendants typically appear normal like "the defendant over there behaving himself and doing nothing to alienate the jury." (R. 3295.) The prosecutor's comments were merely in response to defense counsel's argument. Furthermore, his comments did not in any way imply anything about the appellant's failure to testify. "A prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel." DeBruce v. State, 651 So.2d 599, 609 (Ala.Cr.App.1993), aff'd, 651 So.2d 624 (Ala.1994).
The appellant also argues that the prosecutor made improper inferences about the evidence and told the jury what to think. Specifically, he argues that the prosecutor improperly called him a liar. During rebuttal, the prosecutor argued:
"They talked aboutâ one time it was kind of a mitigating circumstance about his candor on the videotape. We know he either lied to the psychologist or he lied on the tape about the drugs, one of the two. We know he lied about Jamie Dobbs. There is no question that he made that phone call, I don't think, and I don't think it's in your minds either. You can clearly tell it is his voice on the tape. Why he would lie about that when he admitted to two murders, I don't know. I don't have an answer for that."
(R. 3292.) The foregoing was proper argument by the prosecutor regarding the inconsistencies in the appellant's videotaped confession and the psychologist's testimony. The psychologist testified that the appellant told him he was intoxicated and on drugs on the night of the murders, but the appellant denied that in his videotaped confession. Regarding the prosecutor's comment about the telephone call, there was evidence that the appellant made a 911 telephone call and identified himself as "Jamie Dobbs." However, in his videotaped confession, the appellant denied making that call. "During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference." Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987) (citation omitted), rev'd on other grounds, 523 So.2d 1118 (Ala. 1988). Further, as we previously stated, the prosecutor may argue to impeach the defense's evidence. Stewart v. State, 601 So.2d at 506.
The appellant claims that the prosecutor improperly argued the impact of the murders on the victims' families and that he commented on the opinion of Stacy Terry's family about death as an appropriate sentence. Defense counsel argued that, because the appellant had no criminal history and was young, imprisonment for life without the possibility of parole was a much harsher sentence than death. The prosecutor responded to that argument during rebuttal as follows:
"Life without parole? They asked you in voir dire if you thought that was a tougher sentence than death. I'll tell you one thing; they talk about being down there in that penitentiary and how awful it would be dying in that penitentiary and how terrible it would be to be down there the rest of his life. I'll bet you this; I'll bet you Mr. Terry doesn't think it's a tougher punishment than death. Don't you think the Terrys would be tickled to go to the penitentiary this weekend and visit with their son? Sure, it's a miserable place to be. Sure it's awful to have to drive down there. Who would want to know their kid was in the penitentiary? That's better than *57 having him dead. Tougher than the death penalty? I don't think so."
(R. 3303.) Clearly, the foregoing argument did not refer to the victim's family's opinion regarding what sentence the appellant should receive. Nor does the argument "improperly contrast" the appellant's constitutional rights with the rights of the victim's family, as the appellant contends. (Appellant's brief at p. 105.) The prosecutor did not argue or imply that Mr. Terry wanted the appellant to be sentenced to death; rather he argued that Mr. Terry would much rather have his son be alive and in prison than dead. The prosecutor's argument and example was in response to defense counsel's lengthy argument that the appellant did not deserve death and that life imprisonment without parole was a harsher punishment than death. "The fact that an argument has emotional overtones does not independently indict it as improper, and the propriety of argument rests primarily in the relation of its content to issues relevant to the ... jury's concern." Rutledge v. State, 523 So.2d 1087, 1101 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988).
The appellant claims that the prosecutor improperly argued that death would be a more appropriate sentence than life imprisonment without the possibility of parole because the appellant's death would act as a deterrent for others. He also claims the prosecutor improperly argued that the jury should consider the death penalty as a great deterrent. After defense counsel strongly urged the jury to impose life imprisonment without the possibility of parole rather than death, the prosecutor rebutted with the following:
"I submit to you if the death penalty is given in this case, and one person, just one, any time soon or somebody doesn't kill someone else, just one, save one life, then their deaths won't be completely in vain. I also submit to you, and this is an ugly thing to say and it's ugly to say in front of his parents, but his life in this case is much more valuable to lose than for him to keep. He's not going to accomplish anything for anybody anywhere in the penitentiary for the rest of his life. His death might save one person somewhere sometime. If you believe in the death penalty, in my opinion you have to believe it deters other criminal conduct, at least sometimes. From time to time as a society, and this is obviously not often and easily done, but from time to time there is a time when somebody has to pay the price with the supreme penalty; and in this case, I submit to you this is one of them."
(R. 3304-05.)(Emphasis added to highlight comments about which the appellant complains.)
The appellant claims that the foregoing comments improperly implied to the jury that death was the only punishment that would deter others from committing similar crimes and that, therefore, the comments improperly influenced the jury in making its sentence recommendation. This argument is simply without merit. In capital cases, "the prosecutor and defense counsel shall be given an opportunity to argue for and against respectively the imposition of the death penalty in the individual case." Beck v. State, 396 So.2d 645, 663 (Ala.1980), rev'd on other grounds, 485 So.2d 1201 (Ala.1984). The prosecutor's comments in favor of the death penalty
"`did not imply that the defendant himself would commit illegal acts in the future, nor did the prosecutor seek by inflammatory appeal to arouse in the jurors a personal hostility towards, or fear of, the defendant. Accordingly, the prosecutor's comments properly argued the necessity of law enforcement as a deterrent to crime and as a protection of society.'"
Kuenzel v. State, 577 So.2d 474, 503-04 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
*58 The appellant claims that the prosecutor told the jury that "only people who supported the death penalty could be on the jury." (Appellant's brief at p. 111.) However, the prosecutor did not make this statement at all. He was simply arguing that the jurors had to be able to consider death as punishment to sit on the jury in a capital case. (R. 3306-07.) Thus, the prosecutor's comments in this regard were not erroneous.

B.
The appellant argues that the prosecutor made a number of improper comments during the guilt phase of the trial that deprived him of his right to a fair trial. He claims that the prosecutor made improper inferences from the evidence and imposed his own personal beliefs of guilt on the jury. Specifically, the appellant argues that the following comments made by the prosecutor during the State's closing argument and rebuttal were improper:
1) "The truth is in this case that [the appellant] is a murderer; a capital murderer." (R. 2907.)
2) "We believe, based on the evidence, that you have heard, that is exactly what this is, is a death penalty case." (R. 2950.)
3) "I don't know when [the appellant] checked [Robinson's] pulse to see whether or not he was dead, but he wanted to make sure they were both dead. There is no doubt about his intentions about that." (R. 2902-03.)
4) "I don't think there is any question that Mr. Terry was shot first." (R. 2959.)
5) "I submit to you in this case, we've proven the case to you beyond a reasonable doubt; and if we haven't, I don't know whether we ever would in any case." (R. 2963.)
6) "The defendant looks outside, he intentionally picks up the gun, this gun over here, and more than likely, there is no evidence of this, but this is an inference from the evidence, this is the type of gun that unless you leave a bullet in the chamber, ... that he had to cock it back in order to put a bullet in the chamber."
(R. 2965-66.) The appellant argues that, in making the foregoing comments, the prosecutor improperly expressed his personal opinion of the appellant's guilt and prejudiced his case. Reviewing the prosecutor's closing argument and rebuttal argument in its entirety, we find that the prosecutor's comments were expressions of his opinion based on the facts presented at trial.
"`While it is never proper for the prosecutor to express his personal opinion as to the guilt of the accused during closing argument, reversible error does not occur when the argument complained of constitutes mere expression of opinion concerning inferences, deductions and conclusions drawn from the evidence.'"
Allen v. State, 659 So.2d 135, 139 (Ala.Cr. App.1994) (quoting Sams v. State, 506 So.2d 1027, 1029 (Ala.1986)). "`A prosecutor as well as defense counsel has a right to present his impressions from the evidence,' and `[h]e may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way.' Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App.1980), writ denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981)." Henderson v. State, 584 So.2d 841, 856-57 (Ala.Cr.App.1988). Additionally,
"Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). `In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,' Hooks v. State, 534 So.2d 329, 354 (Ala. Cr.App.1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, *59 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr. App.1990), aff'd, 590 So.2d 369 (Ala. 1991)."
Coral v. State, 628 So.2d 954, 985 (Ala.Cr. App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). Because the prosecutor's comments were inferences drawn from the evidence, we do not find that the appellant was prejudiced by these comments. Smith v. State, 727 So.2d 147 (Ala. Cr.App.1998), aff'd, 727 So.2d 173 (Ala. 1999).
The appellant also claims that the prosecutor improperly told the jury to find him guilty and send a message to society. During closing argument, the prosecutor stated:
"If you look at the evidence, there is but one verdict for both counts, and that is that he is guilty. Think back to that night of July 7 and the early morning hours of July 8, 1995, and return a verdict of guilty and send that message back."
(R. 2907.) The appellant argues that these comments improperly suggested to the jury that it should consider the impact of its verdict on the community. However, when read in context, the prosecutor's appeal to the jury to "send a message" was proper because the prosecutor was urging the jury to protect the public and deter others from committing similar offenses. Sockwell v. State, 675 So.2d 4, 36 (Ala.Cr. App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996).
Additionally, the appellant argues that the prosecutor improperly elicited hearsay testimony from several witnesses at trial, that he led witnesses on direct, and that he vouched for the credibility of his witnesses. Although the appellant argues that the prosecutor vouched for the credibility of the State's witnesses, he refers only to one instance where the prosecutor said during rebuttal, "I thought [the witness] tried to be truthful." (R. 2953.) When read in context, the prosecutor's comment was in response to defense counsel's attack on the witness's credibility during closing argument. The prosecutor clearly stated to the jurors that it was their duty to consider how the witness came across on the stand and make their own decision about his credibility. (R. 2953.)
The appellant cites several pages in the record where he alleges that the prosecutor elicited hearsay testimony from certain witnesses and asked leading questions during direct examination. In many instances in which the appellant argues that the prosecutor elicited hearsay testimony, the appellant objected, and the trial court sustained his objection. Regarding the instances where the appellant did not object to the alleged hearsay testimony or the leading questions, we have reviewed that testimony for plain error. Rule 45A, Ala. R.App. P. After reviewing all of the testimony about which the appellant complains, we do not find that the prosecutor improperly elicited any hearsay that caused the appellant to suffer prejudice. Additionally, we have reviewed the instances in which the appellant claims that the prosecutor asked witnesses leading questions and do not find that the prosecutor improperly questioned the witnesses. Thus, the prosecutor's examination of the witnesses did not constitute plain error.
The appellant also argues that the prosecutor improperly acknowledged the presence of Stacy Terry's family in the courtroom. Specifically, he argues that the prosecutor introduced Mr. Terry to the voir dire panels and allowed him to sit at the State's table during trial. Pursuant to § 15-14-56, Ala.Code 1975, the victim's family has a right to be present at trial and to sit at counsel's table if it so chooses. See also Williams v. State, 601 So.2d 1062, 1079 (Ala.Cr.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. *60 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992); Anderson v. State, 542 So.2d 292, 304-05, (Ala.Cr.App.1987), writ quashed, 542 So.2d 307 (Ala.), cert. denied, 493 U.S. 836, 110 S.Ct. 116, 107 L.Ed.2d 77 (1989). Furthermore, Mr. Terry was acknowledged during voir dire examination so the prosecutor and defense could determine whether any of the prospective jurors knew him and whether that would influence their ability to render an impartial verdict in the case. Therefore, the prosecutor's acknowledgement of Mr. Terry's presence in the courtroom did not unduly influence the jury.
The appellant has alleged several instances of prosecutorial misconduct. However, he has not shown that the alleged instances of misconduct, separately or collectively, rose to the level of plain error and deprived him of a fair trial. Finally, we note that the trial court is presumed to know the law and to disregard any improper comments or evidence in sentencing. Sockwell, 675 So.2d at 36; Lightbourne v. Dugger, 829 F.2d 1012 (11th Cir.1987), cert. denied, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988); Whisenhant v. State, 555 So.2d 219, 229 (Ala.Crim.App.1988), aff'd, 555 So.2d 235 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990). Viewed in the context of the entire trial, the alleged instances of misconduct, even if they did constitute misconduct, did not so infect the trial with unfairness as to make the resulting sentence a denial of due process. Therefore, the appellant's argument that prosecutorial misconduct denied him his right to a fair trial is without merit.

XVII.
The appellant's seventeenth argument is that the trial court bestowed heightened authority upon the foreperson of the jury. During its oral instructions to the jury, the trial court stated:
"When you retire to the jury room to begin to deliberate, your first order of business will be to select a foreman. The foreman will moderate your deliberations and be your spokesman for any communication you have with the Court. When you reach a verdict, the foreman will sign the appropriate verdict forms and notify the Court that you have reached a verdict."
(R. 3018-19). Because the appellant did not object to this instruction, we review this claim for plain error. Rule 45A, Ala. R.App. P.
The appellant argues that the trial court's statement that the foreperson would be the moderator during deliberations and the spokesperson for communications with the court effectively increased the foreperson's authority and allowed the foreperson to screen the jurors' communications with the court. He also argues that this statement gave the petit jury foreperson much more authority than a grand jury foreperson has. However, the duties the trial court stated were similar to some of those that the Alabama Supreme Court classified as merely ministerial in Pace v. State, 714 So.2d 332 (Ala.1997), on remand, 714 So.2d 340 (Ala.Cr.App.), cert. denied, 523 U.S. 1051, 118 S.Ct. 1372, 140 L.Ed.2d 520 (1998). See Rule 12.5, Ala. R.Crim. P. (defining the duties of the grand jury foreman). Furthermore, the trial court's instructions to the jury emphasized the importance of each juror's opinion, recollections, and vote. First, the trial court instructed the jury that,
"In order to find the accused guilty of capital murder or any other offense, you must be unanimous in your decision. Each jury member must be separately satisfied beyond a reasonable doubt that the accused committed the crime at issue in order to return a verdict of guilty."
(R. 3010.) When instructing the jury on the use of notes made during trial, the trial court stated,
"Your notes are only to be an aide to your memory. Those jurors who have not taken notes should rely on their own memory of the evidence and should not *61 be influenced by another juror's notes if the notes do not coincide with their memory. Notes are intended for the notetaker's own personal use."

(R. 3012) (emphasis added). Finally, the trial court stated:
"It's now time for you, the jury, to reach a verdict. Your verdict must be unanimous. That is, all twelve of you must individually and jointly agree with the verdict. It must be the verdict of all of you.
"Both the prosecution and the defendant are entitled to the individual opinion of each juror. Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself, but you should do so only after discussing the evidence and instructions with other jurors. Do not decide any question in a particular way simply because a majority of the jurors or any of them favor such a decision.
"I charge you that it is your duty to confer with fellow jurors and to discuss the evidence with them.
"The verdict which you render must represent the real and conscientious judgment and honest conclusions of each of you and not one of you may surrender his or her earnest belief concerning the guilt or innocence of the defendant, Corey Maples, for the purpose of preventing disagreement or for the purpose of arriving at a compromise, notwithstanding the duration of this trial."
(R. 3013-14.) When viewed in context, the trial court's instruction did not bestow heightened authority on the jury foreperson and diminish the importance of the remaining jurors' votes. Therefore, there was no plain error in this regard.

XVIII.
The appellant's eighteenth argument is that the trial court erred in admitting evidence of prior uncharged criminal conduct.

A.
First, he argues that the admission of a fingerprint card and testimony concerning the fingerprint card constituted impermissible evidence of his prior criminal conduct. At trial, the State offered into evidence a fingerprint card made at the Decatur Police Department when the appellant was previously arrested for driving under the influence, driving with a suspended license, and speeding. The State and the appellant agreed that only a redacted photostatic copy of the fingerprint card would be submitted to the jury. Officer Harding, the officer who took the fingerprints, testified at trial. During the State's direct examination of Officer Harding, the following occurred:
"[Harding]: When they are booked in or brought into the city jail for some reason, we take their fingerprints and pictures and process them.
"[Prosecutor]: At some period of time did you take Mr. Maples's fingerprints?
"[Harding]: Yes, sir, I did."
(R. 2379-80.) After the prosecutor finished his direct examination of Officer Harding, the appellant moved for a mistrial, claiming that Harding's testimony indicated that he had previously been arrested. A motion for a mistrial must be made as soon as the grounds for the motion become apparent, and "`"[t]he motion is untimely if it is not made until the conclusion of the witness's testimony."'" LaFontaine v. State, 668 So.2d 119, 121 (Ala.Cr.App.1995) (quoting Allen v. State, 659 So.2d 135, 144 (Ala.Cr.App.1994)). Thus, his motion for a mistrial was untimely. Furthermore, the appellant did not object when the fingerprint card was later admitted into evidence. Thus, we review this issue for plain error. Rule 45A, Ala. R.App. P.
In Woodson v. State, 405 So.2d 967 (Ala. Cr.App.), cert. denied, 405 So.2d 969 (Ala. 1981), we set forth the following general rule for the admission of fingerprint cards:
"[T]he admission of a defendant's fingerprint identification card is not impermissibly prejudicial to the defendant where *62 the card was altered prior to its introduction so that it did not disclose the defendant's criminal record. See Annot. 28 A.L.R.2d 1115 at Section 12 (1953). No prejudicial error has been found where the card does not indicate any prior criminal record or where such has been deleted or obliterated. United States v. Mancini, 396 F.Supp. 75 (E.D.Pa.1975); State v. Ralls, 167 Conn. 408, 356 A.2d 147 (1974); Bradshaw v. State, 132 Ga.App. 363, 208 S.E.2d 173 (1974); Edmonds v. State, 5 Md.App. 132, 245 A.2d 618 (1968); State v. Jackson, 284 N.C. 321, 200 S.E.2d 626 (1973); Lester v. State, 416 P.2d 52 (Okl.Cr. 1966); Burton v. State, 471 S.W.2d 817 (Tex.Cr.App.1971).
"The date (even if it is before the offense involved in the trial) and the place of taking (the police department) need not be eliminated from the fingerprint record before the card is introduced into evidence. Parrish v. State, 366 So.2d 530 (Fla.App.1979).
"Each case of alleged error in the admission of a fingerprint record taken pursuant to another criminal offense and prior to the charge for which the accused is presently on trial must be judged upon its own merits."
405 So.2d at 968-69. The redacted copy of the fingerprint card did not contain any reference to the appellant's prior arrest record. The offenses involved and the headings "Date Arrested" and "Date of Offense" were deleted from the copy of the fingerprint card. Furthermore, Harding never testified that the appellant was booked into the jail or that he was arrested. In fact, the State did not present any evidence concerning the circumstances surrounding fingerprinting the appellant.
The appellant argues that the admission of the fingerprint card and of the testimony about the fingerprint card was extremely prejudicial because he argued that his lack of a significant criminal history was a mitigating circumstance. According to the appellant, the jury might have used this evidence to reject this mitigating circumstance. However, the State conceded during the penalty phase that the appellant had no significant criminal history. (R. 3079, 3252, and 3296.) Furthermore, the trial court charged the jury that, as a matter of law, the mitigating circumstance that the appellant had no significant history of criminal activity existed. (R. 3326). Accordingly, the appellant has not shown that the admission of the fingerprint card and the testimony concerning the fingerprint card prejudiced him. Thus, their admission did not' constitute plain error.

B.
Next, the appellant argues that the trial court erred in admitting photographs that depicted stolen street signs in his bedroom. State's Exhibits 41, 42, and 43 showed a bedroom in the trailer where the appellant lived with his father, stepmother, and younger half brother. On the walls were various signs that appear to be street signs. The appellant did not object to the admission of these photographs at trial. Thus, we review this issue for plain error. Rule 45A, Ala. R.App. P.
The photographs in question were part of a series of photographs showing the interior of the trailer. There was no testimony that the photographs depicted the appellant's bedroom. Rather, Exhibits 41, 42, and 43 showed "another bedroom in the mobile home." (R. 1591-92.) There is nothing to show that the appellant stole the street signs or that they were, in fact, in the appellant's bedroom. Accordingly, the appellant has not shown that the admission of these photographs did or probably did affect one of his substantial rights, and there was no plain error in this regard.

XIX.
The appellant's nineteenth argument is that the jury was improperly required to conduct a portion of its deliberations and review of the evidence in open court. Specifically, he argues that the *63 jury's review of parts of an audiotape and a videotape in the courtroom where the judge, counsel, one victim's family members, and other members of the public were present interfered with the jury's right to deliberate free from outside influences. Because the appellant did not present this argument to the trial court, we review it for plain error. Rule 45A, Ala. R.App. P.
After the jury retired to deliberate, it asked the trial court to play a few minutes of the appellant's videotaped confession and an audiotape of the 911 telephone call so it could make a voice comparison. The trial court agreed to play a few minutes of each tape for the jury, but it wanted to make sure the jury did not view evidence that had been excluded at trial. Therefore, it cued the tapes before the jurors entered the courtroom. The appellant did not object to these arrangements and, in fact, participated in a discussion with the trial court about which parts of the tapes should be used. The trial court had previously instructed the jury not to deliberate outside the jury room. (R. 3020.) Furthermore, on two separate occasions, the trial court cautioned the jurors not to deliberate while viewing the videotape. During its oral charge, the trial court explained that if the jury wished to review the videotape, it would have to do so in the courtroom because of the size of the equipment. The trial court further instructed the jury as follows:
"I would warn you now in case I forget to, if that happens, I don't want you discussing and deliberating in our presence out here. You will need to come in and watch the tape, keep your mouths closed, and then go back in the jury room to talk about it rather than coming back out here and start arguing with each other about what might have been said."
(R. 3024.) Just before the jury reviewed the tapes, the trial court again instructed:
"[A]s I cautioned you yesterday, I don't want any discussion going on. I want you to listen to whatever you want to listen to as many times as you want to listen to it and then save your comments to other jurors until you go back to the jury room and close the door. I don't want any deliberations being conducted out here in the presence of the Court or other spectators."
(R. 3044-45.)
The record shows that the jury reviewed the tapes for a few minutes and then immediately retired to the jury room to resume its deliberations. There is absolutely nothing in the record to indicate that any deliberations occurred in the courtroom. Thus, the appellant's contention that the arrangement interfered with the jury's right to deliberate free from outside influences is refuted by the record. Compare Collins v. State, 611 So.2d 498 (Ala. Cr.App.1992), in which we held that the trial court did not err in monitoring the jury's review of a redacted videotape. Furthermore, there is no indication that the trial court's actions adversely affected the appellant's "substantial rights," or had an unfair prejudicial impact on the jury's deliberations. Therefore, the trial court did not err in allowing the jury to review the tapes in the courtroom.

XX.
The appellant's twentieth argument is that the trial court improperly refused to give several of his requested jury instructions.
"A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Cr.App. 1991). A trial court's oral charge to the jury must be construed as a whole, and must be given a reasonableâ not a strainedâ construction. King v. State, 595 So.2d 539 (Ala.Cr.App.1991); Kennedy v. State, 472 So.2d 1092 (Ala.Cr. App.1984)." *64 Williams v. State, 710 So.2d 1276, 1305 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).
"`A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr. App.1986). When requested charges are either fairly and substantially covered by the trial judge's oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges. Ex parte Wilhite, 485 So.2d 787 (Ala.1986).'

"Ward v. State, 610 So.2d 1190, 1194 (Ala.Cr.App.1992)."
Hemphill v. State, 669 So.2d 1020, 1021 (Ala.Cr.App.1995)(emphasis omitted). See also Dill v. State, 600 So.2d 343, 353-54 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).

A.
The appellant argues that, during its guilt-phase instructions, the trial court improperly refused to give several of his requested charges. Although he lists 43 refused charges, he only specifically argues that the trial court improperly refused to give 9 of the requested charges. Charges 22 through 30 addressed the manner by which the jury should consider and evaluate the testimony of witnesses, including expert witnesses. During the charge conference, the trial court stated that its charge would substantially cover all of the requested charges except number 25. (R. 2803-05.) The trial court found that requested charge 25 did not apply because no independent investigators or laboratory workers had testified in the case. (R. 2804.) We have reviewed the trial court's guilt-phase oral charge, and we find that it substantially covered the appellant's requested charges concerning the consideration and evaluation of the testimony of witnesses.
Furthermore, we have reviewed the remaining charges that the appellant lists as improperly refused but does not specifically address (charges 2, 3, 4, 5, 6, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 48, 49, 50, 51, 53, and 54). The trial court properly refused to give requested charges 2, 3, 4, 5, 6, 8, 9, 11, 12, 15, 16, 18, 19, 36, 37, 43, 48, 49, 50, 51, and 54 because they were substantially covered in its oral charge. The trial court properly refused to give requested charges 13, 14, 17, 20, 33, 34, 35, 38, 39, 40, 41, 42, and 53 because they were confusing, misleading, not predicated on a consideration of the evidence, or abstract or they misstated the law. Accordingly, the appellant's argument is without merit.

B.
The appellant also argues that, during its penalty phase instructions, the trial court improperly refused to give his requested charges numbered 2, 3, 4, 6, and 11. The charges concerned the meaning of a sentence of life imprisonment without the possibility of parole and a sentence of death; the fact that the jurors would determine what the recommended sentence would be; the law governing the consideration of mitigating and aggravating circumstances; and a list of mitigating circumstances offered by the appellant. (C.R.512-15, 517, 522.) During the charge conference, the trial judge stated that he was refusing to give requested charges 2, 3, 4, and 6 because he substantially covered them in his oral charge. (R. 3227-29.) As to requested charge 11, the trial court noted that it would not instruct on one of the alleged mitigating circumstances, and the defense withdrew its request that the trial court instruct on one other alleged mitigating circumstance. (R. 3230.) The trial court stated that it would substantially cover the remaining mitigating circumstances listed in requested *65 charge 11 in its oral charge. With the exception of those two mitigating factors discussed above, about which the appellant did not present any evidence, the trial court substantially covered each of the requested charges in its oral charge. See Hemphill, supra; Ward v. State, 610 So.2d 1190 (Ala.Cr.App.1992). Therefore, we find no error in this regard.

XXI.
The appellant's twenty-first argument is that the trial court improperly instructed the jury on the law. First, he contends that the trial court's reasonable doubt instruction was confusing and incorrect. Second, he claims that the trial court instructed the jury that it could consider any circumstances in aggravation. Because the appellant did not present these claims to the trial court, we review them for plain error. Rule 45A, Ala. R.App. P.
When reviewing the challenged jury instructions, we bear in mind the following principles. A trial court has broad discretion in its formulation of jury instructions. Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court's instructions, "`the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.'" Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App. 1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).

A.
The appellant argues that the trial court improperly instructed the jury on reasonable doubt. He challenges the following statement the trial court made to the jury immediately before the guilt-phase opening arguments began:
"That burden, we have talked about in the voir dire process, is to satisfy you of the defendant's guilt beyond a reasonable doubt. In other words, by the close of this case, in order for you to return a verdict of guilty, you must not be able to say that you believe the defendant is not guilty, and give a good reason why you believe that, if you are going to convict him. If, after the close of the case, you still have some doubt or doubts for which you can articulate or give a reason, not an imaginary or fanciful reason, but a legitimate reason, then you should acquit the defendant."
(R. 1443-44.) Specifically, he alleges that the definition of reasonable doubt was "baffling and utterly confusing" and that the statement impermissibly shifted the burden of proof to him. (Appellant's brief at p. 131.) We disagree. Initially, we note that the trial court made the statement during its introductory remarks to the jury, not during its oral charge. Moreover, during its guilt-phase instructions, the trial court thoroughly explained the concept of reasonable doubt to the jury as follows:
"As I have already told you, the burden is on the State to prove the defendant's guilt as charged. Before a conviction can be had in this case, the State must satisfy each and every member of the jury of the defendant's guilt beyond a reasonable doubt. Even if the State demonstrates a probability of guilt, if the State does not establish the defendant's guilt beyond a reasonable doubt, you must acquit the defendant.
"To clarify the term reasonable doubt, it may help you to some extent for me to say that the doubt which would justify an acquittal must be an actual doubt and not a mere guess or a surmise. It is not a forced or a capricious doubt because everything that relates to human affairs is open to some possible or imaginary doubt. The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt. It is a doubt which arises from all or part of the evidence, or from a lack of evidence, or from contradictory evidence which remains *66 after careful consideration of all the evidence. You will observe that the State is not required to convince you of the defendant's guilt beyond all doubt, but simply beyond a reasonable doubt."
(R. 2974-75.) The trial court further explained:
"In a criminal case such as this, the burden of proof rests on the prosecution. The prosecutor must prove every essential element of the crime beyond a reasonable doubt. This burden of proof on the prosecution to establish the defendant's guilt beyond a reasonable doubt never shifts. The defendant is under no obligation to prove his innocence, nor is he under an obligation to prove anything.
"The term reasonable doubt is expressed very easily, but it sometimes is difficult to define. It is such a doubt as reasonable men and women would entertain after a careful and honest review and consideration of all the evidence in the case. It must be found that in reason it must survive the test of reasoning or the mental processes of such a reasonable examination. It must be such a doubt that arises from some question from the evidence and it must be such a doubt that that a reasonable man or woman would entertain after examining all the evidence. A reasonable doubt, as I have mentioned, may arise not only from the evidence produced, but also from a lack of evidence. The burden is upon the State to prove the defendant guilty beyond a reasonable doubt of every essential element of the crime charged.
"The defendant has the right to rely upon the failure of the prosecution to establish proof. A defendant may also rely upon evidence brought out on cross examination of witnesses for the prosecution and upon evidence presented on behalf of the defendant. The law never imposes upon a defendant in a criminal case the burden or duty of producing any evidence. A reasonable doubt exists in any case when, after careful and impartial consideration of all the evidence in the case, the jurors do not feel convinced beyond a reasonable doubt that the defendant is guilty of the charge.
"If, after comparing and considering all the evidence in this case, your minds are left in such a condition that you cannot say you have an abiding conviction beyond a reasonable doubt of the defendant's guilt, then you are not convinced beyond a reasonable doubt and the defendant will be entitled to a not guilty verdict.
"The rule which requires proof beyond a reasonable doubt is applicable to every single element necessary that constitutes the crime charged so that if you are not satisfied beyond a reasonable doubt on a single element, you must find the defendant not guilty."
(R. 3007-09.) The court's instruction clearly conveyed the definition of reasonable doubt to the jury, and it did not impermissibly shift the burden of proof to the appellant. Furthermore, the instruction on reasonable doubt did not violate the principles set forth in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Thus, we find the appellant's argument to be without merit.

B.
The appellant also argues that, even though only one statutory aggravating circumstance applied in his case, the trial court incorrectly instructed the jury that it could consider any circumstances in aggravation. During its penalty-phase charge, the trial court instructed the jury as follows:
"The issue at this sentencing hearing concerns circumstances of aggravation and circumstances of mitigation that you should consider and weigh against each other in deciding what the proper punishment is in this case. In making your recommendation concerning what the punishment should be, you must determine whether any aggravating circumstance *67 exists, and if so, you must determine whether any mitigating circumstance exists. You should consider the evidence presented at this sentencing hearing. You should also consider any evidence that was presented during the guilt phase of the trial that is relevant to the existence of an aggravating or mitigating circumstance."
(R. 3321-22.) The appellant argues that the last sentence of the above-cited portion of the trial court's instruction indicated to the jurors that they could consider "any" aggravating circumstance and evidence. However, the trial court did not instruct the jurors that they could consider "any" aggravating circumstances. In fact, the trial court specifically instructed the jury that it could consider only one aggravating circumstance in the case. Immediately after the trial court made above-referenced statement, it further instructed the jury as follows:
"The law of Alabama provides a list of aggravating circumstances that may be considered by the jury in recommending punishment if the jury is convinced beyond a reasonable doubt from the evidence that one or any of such aggravating circumstances exist in this case. The same definitions that I gave you earlier in the guilt phase of the trial concerning reasonable doubt apply to this matter also. If the jury is not convinced beyond a reasonable doubt, based upon the evidence, that one or more such aggravating circumstances exist, then the jury must recommend that the defendant's punishment be life imprisonment without parole, regardless of whether there are any mitigating circumstances in the case. Of the list of aggravating circumstances provided by law, there is one circumstance which you may consider in this case if you are convinced beyond a reasonable doubt based on the evidence that the circumstance does exist. The aggravating circumstance that you may consider in this case is as follows: the capital offense was committed while the defendant was engaged in the commission of a robbery. As I stated before, the burden of proof is on the State to convince each of you beyond a reasonable doubt as to the existence of any aggravating circumstance considered by you in determining what punishment is to be recommended in this case. This means before you can even consider recommending that the defendant's punishment be death, you must be convinced beyond a reasonable doubt based on the evidence that at least one aggravating circumstance exists.
"In deciding whether the State has proven beyond a reasonable doubt the existence of an aggravating circumstance, you should bear in mind the definition I gave you as to reasonable doubt. The defendant does not have to prove anything about an aggravating circumstance. The burden is wholly upon the State to prove such a circumstance beyond a reasonable doubt. A reasonable doubt about an aggravating circumstance my arise from all the evidence, from any part of the evidence, or from a lack or failure of the evidence. You may not consider any other aggravating factor other than the one upon which I have instructed you. You may not consider any aggravating circumstance unless you are convinced beyond a reasonable doubt of the existence of that aggravating circumstance in this case. If you find no aggravating circumstance has been proven beyond a reasonable doubt to exist in this case, then you must return a verdict recommending a sentence of life imprisonment without parole. In that event, you need not concern yourself with mitigating circumstances in this case. If you find beyond a reasonable doubt that an aggravating circumstance on which I have instructed you does exist in this case, then you must proceed to consider and determine the mitigating circumstances." *68 (R. 3322-25.) (emphasis added). Thus, reading the challenged statement in the context of the trial court's entire charge, we find no error.

XXII.
The appellant's twenty-second argument is that the trial court improperly refused to grant his motion to prevent the State from diminishing the jury's role in sentencing in his case. This assertion is refuted by the record. The trial court denied the appellant's first motion on this ground during a pretrial hearing. However, when the appellant presented a similar motion immediately before the voir dire examination began, it granted the request. In this regard, the trial court noted:
"I will grant the motion, though, to the extent that would keep the State from crossing the line.... And in diminishing the overwhelming responsibilityâ the `awesome responsibility' I think the Supreme Court called it; I don't want that diminished in any way, and to that extent, I will grant the motion, but I don't propose to put any extraordinary limitations on it, nor do I propose to lie to the jury about the true process that occurs in Alabama."
(R. 405.) Furthermore, we have reviewed the entire record and have not found any instance in which the State improperly diminished the jury's role in this case. During various stages of the trial, both the prosecutor and defense counsel referred to the jury's sentence as a "recommendation." However, neither attempted in any way to diminish or minimize the jury's role in sentencing. Therefore, the appellant's argument is without merit.

XXIII.
The appellant's twenty-third argument is that the trial court should have ordered a change of venue for his trial. Specifically, he claims that the media extensively covered the murders, the investigation, his arrest, and his upcoming trial. He also claims that one-half of the jurors in the jury pool had heard about the case.
"`Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State, 424 So.2d 1353 (Ala.Crim. App.1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Crim.App. 1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):
"`"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court...."
"`The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, "[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination." Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App. 1978).' *69 "Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1986[1985])."
Williams v. State, 565 So.2d 1233, 1237-38 (Ala.Cr.App.1990).
"The way to demonstrate actual jury prejudice is through an extensive and thorough voir dire examination. Anderson. There is no question that the voir dire examination in the case at bar was both thorough and extensive as to each prospective juror's knowledge of and feelings about this case. The fact that virtually every prospective juror had some knowledge of the appellant's case does not mean the appellant could not receive a fair and impartial trial. See Thomas[ v. State, 539 So.2d 375 (Ala.Crim.App.1988)]. Merely because these jurors were not totally ignorant of the facts and issues in this case, does not mean they were unable to render a fair and unbiased verdict. Anderson."
Holladay v. State, 549 So.2d 122, 126 (Ala. Cr.App.1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989). Furthermore, the passage of time between the initial publicity surrounding the commission of the offense and the time of the trial "`cannot be ignored as a factor in bringing objectivity to the trial.'" Robinson v. State, 430 So.2d 883, 886 (Ala.Cr.App.1983) (quoting Dannelly v. State, 47 Ala.App. 363, 254 So.2d 434, cert. denied, 287 Ala. 729, 254 So.2d 443 (1971)). See also Pilot v. State, 607 So.2d 306 (Ala.Cr.App.), aff'd, 607 So.2d 311 (Ala.1992).
During voir dire examination, both the district attorney and defense counsel extensively questioned potential jurors about their exposure to pretrial publicity about the murders. The appellant correctly points out that many of the potential jurors indicated that they had read or heard something about the case. However, there was no indication that any of the jurors were biased against the appellant or had fixed opinions as to his guilt or innocence as a result of the publicity. In addition, the trial of this case occurred more than two years after the murders were committed. As the trial court correctly noted when denying the appellant's request:
"I think the best evidence that I need to consider is the sixty jurors that we saw. It's my opinion that none of them were disqualified in any way by what they have read or may have reard[heard]. A comment was made and all the jurors on that particular panel laughed when one juror said particularly the Decatur Daily, he wouldn't believe what he read in it. Even though there was some general exposure to these articles, even though there was someâ I remember one man said he heard it on the radio; but the fact that the crime was committed by someone is about all they remembered; so I will deny the motion for change of venue. I believe that we have an excellent group of jurors who can give the defendant a fair trial, and I don't believe some two years after the crimes were committed that this venire panel as a whole has any negative impact on them remaining, if there ever was any. I'm not sure there was. I'm not saying there was, but at this juncture, I believe Mr. Maples can get as fair a trial here in Morgan County as he could anywhere else, and I'm going to do everything I can to see that he does."
(R. 1369-70.) The appellant did not show that the community was so saturated with prejudicial publicity that he could not receive a fair trial or that any of the pretrial publicity actually biased any of the prospective jurors against him. Instead, he simply made bare allegations that there had been prejudicial pretrial publicity and that this publicity had biased the jurors. Applying the law to the facts of this case, we find that the trial court did not abuse its discretion in refusing to order a change of venue for the appellant's trial.

*70 XXIV.
The appellant's twenty-fourth argument is that the trial court improperly refused to control pretrial publicity. Specifically, he claims that the trial court erroneously denied his motions to seal the file of the case until the jury was sequestered and to control pretrial publicity. We disagree.
When denying the appellant's motions, the trial court explained that the press had not created problems in the past and expressed its concern that excluding the press from any pretrial hearings might create even more negative publicity. Although the appellant now argues that "the media coverage of the pretrial events was extensive and inflammatory," his trial counsel conceded, during a pretrial motion hearing, that there had been little media coverage of the case in the months and weeks immediately preceding the hearing. (R. 176-77.) The trial court also found that, because the file was the primary source of information about the case for the public and the press, sealing the file would unfairly infringe upon the public's right to obtain such information. These were all legitimate concerns that supported the trial court's decision.
We further note that, even though it denied the appellant's motions, the trial court took adequate precautions to control media coverage of this case. In accordance with its standard procedure regarding media coverage, the trial court prohibited cameras from being in the courtroom and on the floor of the courthouse where the courtroom was located during trial. Additionally, both the prosecutor and defense counsel agreed that they would not discuss the case with the press. The trial court further ordered that the transcripts of any pretrial hearings be sealed until the conclusion of the trial, and it noted that the transcript of the trial would not be available until the conclusion of the trial. (R. 181.) Furthermore, the trial court noted that, because the press rarely reported about voir dire proceedings, it would not exclude the press from that portion of the trial. (R. 186.) In denying the motions, however, the trial court informed defense counsel that it would reconsider its rulings if a problem arose. The record does not reflect that the appellant ever raised this issue again.
As we stated in Part XXIII of this opinion, the appellant has not shown that the community was so saturated with prejudicial publicity that he could not receive a fair trial or that any of the prospective jurors were actually prejudiced against him. He has not shown that the venire was so saturated with prejudicial pretrial publicity that he was denied his right to empanel a jury that was fair and impartial. During voir dire examination, many prospective jurors indicated that they had been exposed to some media coverage of the case, but none of them stated that their exposure was so extensive that it would render them unable to weigh the evidence fairly and return an impartial verdict. Therefore, the trial court did not err in denying the appellant's motions.

XXV.
The appellant's twenty-fifth argument is that he "was subject to double jeopardy when the same evidence was used to elevate the intentional murder [to capital murder] and then used it as the sole aggravator to impose the death penalty." (Appellant's brief at p. 138.) Specifically, he refers to evidence that he committed the murder during the course of a robbery because that evidence was used to elevate the murder to a capital offense and because it was also used as an aggravating circumstance in his case. This practice is commonly referred to as "double counting" or "overlapping." He contends that this "double counting" resulted in the arbitrary and capricious imposition of the death sentences, undermined the guiding function that aggravating circumstances are supposed to play, and punished him twice for the same act, thus violating the Fourth, Fifth, Sixth, Eighth, and Fourteenth *71 Amendments to the United States Constitution, the Alabama Constitution, and Alabama law.
Because the appellant merely makes bare allegations that his Fourth, Sixth, Eighth, and Fourteenth Amendment rights were violated, we will address only the Fifth Amendment argument. Section 13A-5-50, Ala.Code 1975, provides, in pertinent part:
"The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence."
Thus, under § 13A-5-50, Ala.Code 1975, a jury may consider an element of capital murder as an aggravating circumstance if that element is specified as an aggravating circumstance in § 13A-5-49, Ala.Code 1975. Finally, this court has held that the use of an element of capital murder as an aggravating circumstance does not punish a defendant twice for the same offense. Burton v. State, 651 So.2d 641 (Ala.Cr. App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).
"`This practice, known as "double counting" or "overlapping," has been upheld. Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Kuenzel [v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)].
"`Section 13A-5-50, Code of Alabama 1975, states, in part, as follows:
"`"The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence."
"`Clearly, § 13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49. Further, this court has repeatedly held that the use of an element of capital murder in such a way does not, as the appellant argues, punish a defendant twice for the same offense. Kuenzel, supra; see also Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
"`"A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy."

"`Kuenzel, 577 So.2d at 488, quoting Fortenberry v. State, 545 So.2d 129, 142 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).'
"Burton, 651 So.2d at 657-58."
Hutcherson, 677 So.2d at 1201. Thus, the appellant's argument is without merit.

XXVI.
The appellant's twenty-sixth argument is that the trial court and prosecutor improperly read the indictment to the jury and thereby relieved the State of its burden of proof. Specifically, he contends that reading the indictment to the jury and informing it that the indictment had been signed by the district attorney informed the jury that another group of individuals had already concluded that he had committed the offense, implied that the prosecutor believed he was guilty, and bolstered the jury's perception of the prosecutor. *72 Because the appellant did not present these claims to the trial court, we review them for plain error. Rule 45A, Ala. R.App. P.
During its initial comments to the jury, the trial court explained that the indictment itself was not evidence; rather, it stated that the evidence came from the witness stand and from the items admitted into evidence during the trial. (R. 1445-46.) It also explained that the State carried the burden of proving the truthfulness of the matters alleged in the indictment before the jury could find the appellant guilty. (R. 1445.)
In his guilt-phase opening statement, the prosecutor explained that the indictment set forth the elements of the offense that the State would be required to prove in each case. After reading the indictment, he encouraged the jurors to use the indictment as a "road map" to determine whether the State had proved each element of each offense. (R. 1460.) In that opening statement, there was no mention that the district attorney had signed the indictment. Furthermore, the prosecutor did not express any personal opinion regarding the appellant's guilt or innocence. (R. 1461-62.)
During his guilt-phase closing argument, the prosecutor again stated that the indictment was not evidence in the case. (R. 2891.) Instead, he likened the indictment to a question that asked whether the State had proved what it must to convict the appellant. (R. 2891.) When he read the indictment, he did not mention that the district attorney had signed the indictment, and he did not indicate that he believed the appellant was guilty.
During its guilt-phase closing instructions, the trial court cautioned the jury that the indictment was not evidence, and then read the indictment, including the district attorney's signature, to the jury. (R. 2971-73.) Immediately after reading the indictment, the trial court further instructed the jury as follows:
"As I said, you're not to consider the indictment as evidence. It is merely a written charge made by the State. Your duty is to decide the facts. You take the law as I give it to you and the evidence as it has been presented, and therefrom determine the true facts. To the charge placed against him, the defendant has pled not guilty. He is cloaked with the presumption of innocence that is with him when he enters upon the trial of the case, and this presumption stays with him as a shield against his conviction until, but only until, the State meets its burden of proof and proves his guilt."
(R. 2973.) Later in its charge, the trial court further explained to the jury:
"The indictment is a written accusation charging the defendant with the commission of a crime; in this case capital murder. The indictment is without probative force and carries with it no implication of guilt. The fact that the Grand Jury returned an indictment is in no way any evidence against the defendant and no adverse inference can be drawn against the defendant from the finding of an indictment."
(R. 3009-10.) This court has stated:
"The appellant further argues that his indictment violated the Sixth Amendment of the United States Constitution, because the trial judge, by reading his indictment to the jury prior to the commencement of trial, gave the jury the impression that he was already guilty of the charges against him. However, an indictment is issued in order to ensure that an accused is aware of the nature of the charges against him and to protect him from future jeopardy. The reading of an indictment before a jury at the commencement of trial merely provides a starting point or framework from which a juror can interpret the evidence. The trial court, as in the instant case, informs the jury that the indictment is not to be considered as evidence against the appellant, and therefore, the appellant suffered no prejudice."
*73 Rheuark v. State, 601 So.2d 135, 140-41 (Ala.Cr.App.1992).
"Moreover, the district attorney's noting in reading the indictment to the jury, that it was signed by him, is not an injection of his personal belief or otherwise improper. Similarly, in Arthur v. State, 711 So.2d 1031 (Ala.Cr.App.1996), the appellant argued that the prosecutor improperly inserted his credibility in an attempt to bolster the possibility of conviction by stating that the indictment had been signed by him in his capacity as district attorney. This Court stated:
"`Despite the appellant's argument to the contrary, there was no implication by the prosecutor [or the trial court] in this case that he believed the appellant to be guilty.... The jury was amply instructed that an indictment is not an indication of guilt but rather a vehicle for bringing an individual to trial and the [trial court's] acknowledgment that [the prosecutor] signed the indictment in his capacity as district attorney was a statement of fact rather than an opinion or insertion of credibility.'

"Arthur, 711 So.2d at 1054. In the present case, the district attorney was merely reading the indictment to the jury, and his signature was recited as a portion of the indictment and a statement of fact."
Boyd v. State, 715 So.2d 825, 841-42 (Ala. Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).
We have reviewed the trial court's instructions and the prosecutor's comments, and we do not find that they were improper. Neither stated or implied that the indictment was evidence or that the district attorney's signature on the indictment indicated that the prosecutor believed the appellant was guilty. Rather, both explained that the indictment was not evidence and reminded the jurors that it was their duty to weigh the evidence presented in determining the appellant's guilt. Therefore, we find no error in this regard.

XXVII.
The appellant's twenty-seventh argument is that he was unconstitutionally required to give physical exemplars at the State's request. Specifically, he argues that the trial court issued contradictory and confusing orders regarding the exemplars by first denying and then later granting the State's request. He also argues that the State's interest in obtaining the physical exemplars did not outweigh his right to be free from such intrusions as collecting blood and other physical exemplars. Because the appellant did not present this claim to the trial court, we review it for plain error. Rule 45A, Ala. R.App. P.
The trial court first gave the State permission to obtain physical exemplars in December 1995, but the State did not obtain the samples. Later, on February 7, 1997, four weeks before the trial was scheduled to begin, the State filed a second motion for production of the exemplars. The trial court noted that the State's request came too close to the trial date to afford the appellant an opportunity to secure independent testing of the samples without a continuance. Because it did not want to delay the trial further, the trial court denied the request. However, on February 21, 1997, the trial court granted the State's request for a continuance based on an assistant district attorney's conflict of interest. At that hearing, the trial court also stated that it would reconsider its ruling on the State's request for the exemplars because the taking of the samples and the appellant's independent analysis would no longer delay the trial. The appellant objected generally to the continuance, but did not object to the trial court's granting of the discovery request.
Rule 16.2(b), Ala. R.Crim. P., provides, in pertinent part:
"(b) Personal Physical Evidence. Upon motion of the state/municipality *74 and solely in connection with the particular offense with which the defendant is charged, the court shall order the defendant to:
". . . .
"(3) Be fingerprinted, palm-printed, footprinted, or voice-printed;
". . . .
"(6) Permit the taking of samples of defendant's hair, blood, saliva, urine, or other specified materials which involve no unreasonable intrusions into the body...."
Furthermore, the Alabama Legislature addressed law enforcement agencies' need for scientific testing in § 36-18-20, Ala. Code 1975, which provides as follows:
"(a) That the tragic incidence of violent crime in our society is growing at an alarming rate, and that these offenses oftentimes are committed by repeat or habitual offenders against our most innocent and defenseless citizens.
"(b) That there is a critical and urgent need to provide law enforcement officers and agencies with the latest scientific technology available for the purpose of identifying, apprehending, arresting, and convicting those violent offenders.
"(c) That DNA testing, profiling, and analysis allows a more certain and rapid identification of such offenders as well as the exoneration of those wrongfully suspected or accused.
"That genetic identification technology through DNA testing is generally accepted in the relevant scientific community."
The trial court did not err in granting the State's request for physical exemplars. Under Rule 16.2, Ala. R.Crim. P., the State has a right to obtain such samples. The trial court acknowledged that right in its initial decision, but also recognized that granting the request at that time would require a continuance. Therefore, it initially denied the State's request. However, when the trial was subsequently continued for another reason, the trial court acted within its discretion in revisiting the issue and granting the State's request. Because the State had a right to obtain the exemplars, the trial court did not err in changing its decision and granting the State's request. Furthermore, law enforcement agencies have a "critical and urgent" need for scientific testing in the investigation and prosecution of criminal cases, as the Alabama Legislature recognized. Therefore, the State's interest in obtaining physical exemplars for DNA testing did outweigh the appellant's right to be free from physical intrusions. Accordingly, the appellant's claim is without merit.

XXVIII.
The appellant's twenty-eighth argument is that the trial court improperly dismissed for cause veniremembers who expressed reservations about the death penalty. He does not specifically name any veniremembers who were dismissed for cause based on their expressed reservation about imposing the death penalty. As best we can discern from the record cites he includes in his brief to this court, it appears that he is referring to veniremembers J.R., M.B., and W.H. Because the appellant did not object at trial to the dismissal of these veniremembers, we must review this claim for plain error. Rule 45A, Ala. R.App. P.
Regarding challenges for cause in capital cases, § 12-16-152, Ala. Code 1975, provides:
"On the trial for any offense which may be punished capitally or by imprisonment in the penitentiary, it is a good cause of challenge by the state that the person would refuse to impose the death penalty regardless of the evidence produced or has a fixed opinion against penitentiary punishment or thinks that a conviction should not be had on circumstantial evidence, which cause of challenge may be proved by the oath of the person or by other evidence." *75 See also Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App.1994), rev'd on other grounds, 677 So.2d 1205 (Ala.1996); Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App. 1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996).
"`"The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is `whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."` Wainwright v. Witt, 469 U.S. 412, [423], 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648 [at 657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). `The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment.' Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with `unmistakable clarity' because `juror bias cannot be reduced to question and answer sessions which obtain results in the manner of a catechism.' Id.

"`"A trial judge's finding on whether or not a particular juror is biased `is based upon determination of demeanor and credibility that are peculiarly within a trial judge's province.' Witt, 469 U.S. at 428, 105 S.Ct. at 854. That finding must be accorded proper deference on appeal. Id. `A trial court's rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.' Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981)."

"`Martin v. State, 548 So.2d 488, 490-91 (Ala.Cr.App.1988), affirmed, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). "[A] blanket declaration of support of or opposition to the death penalty is not necessary for a trial judges to disqualify a juror." Ex parte Whisenhant, 555 So.2d 235, 241 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990).'"
Dallas v. State, 711 So.2d 1101, 1107 (Ala. Cr.App.1997), aff'd, 711 So.2d 1114 (Ala.), cert. denied, 525 U.S. 860, 119 S.Ct. 145, 142 L.Ed.2d 118 (1998) (quoting Taylor v. State, 666 So.2d 36, 47 (Ala.Cr.App.), opinion extended after remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)).
With respect to the challenge for cause as to veniremember J.R., the following occurred:
"[Prosecutor]: Your Honor, we're going to challenge juror number 35, [J.R.]. He did state in reference to the death penalty that he could not return a death verdict. He also had several other answers about knowing people and about how he believed it might affect his verdict in this case; some of the witnesses he knew, and some of the attitudes he had regarding law enforcement and some other things, and he also felt like maybe his prior public intoxication conviction might have some effect on it. Just from the totality of his answers, and particularly the one regarding the death penalty, we just don't feel like he would be able to exclude any other outside influences from his decision.
"The Court: What does the defense say?
"[Defense counsel]: No objection.
"The Court: It appeared to me that [J.R.] was going to do or say whatever was necessary to get off of this jury. I'm going to grant that challenge for cause as to [J.R.] It might ought to be a joint challenge. I don't know.

*76 "[Defense counsel]: He was actually on our list, Your Honor."
(R. 671-73.)
During voir dire examination, J.R. specifically stated that he could not sentence a defendant to death. (R. 538.) Accordingly, the trial court properly granted the State's challenge for cause as to veniremember J.R.
With respect to the challenge for cause as to veniremember M.B., the following occurred:
"[Prosecutor]: We would move to challenge juror number 58, [M.B.]
"The Court: Granted. I don't think there is much debate over that, is there, Mr. Craig? I will allow you to be heard, but based on his responses, he struck me as one of the jurors did yesterday; he was going to do or say whatever was necessary to get out of service on this jury.
"[Defense counsel]: Your Honor, we stand mootâ not moot, but mute on that challenge."
(R. 902-03.)
During voir dire examination, M.B. repeatedly stated that he was opposed to capital punishment and that he could not impose a sentence of death. (R. 461, 753, 755, 778-79, 859-60.) Because M.B. repeatedly stated his opposition to capital punishment, the trial court properly granted the State's challenge for cause as to veniremember M.B.
With respect to the challenge for cause as to veniremember W.H., the following occurred:
"[Prosecutor]: Your Honor, we challenge juror number 51, [W.H.]. In his answers to the questions, [W.H.] stated that he could not convict somebody based on circumstantial evidence.
"The Court: Defense?
"[Defense counsel]: Your Honor, we have no objection to that.
"The Court: I will grant the challenge to juror number 51. He did say, and I wrote it down, that he could not convict on circumstantial evidence; and I thought there was an excellent explanation given."
(R. 665-66.) During voir dire examination, W.H. specifically stated that he could not convict a person of capital murder based only on circumstantial evidence. (R. 526.) Therefore, the trial court properly granted the State's challenge for cause as to veniremember W.H.

XXIX.
The appellant's twenty-ninth argument is that the trial court erroneously admitted photographs and allowed a slide show that served no purpose but to inflame the passions of the jury.[4] He specifically challenged five pre-autopsy photographs that were shown to the jury by way of a slide show. As to the remaining photographs, he makes only generalizations and does not specify which photographs he finds objectionable.[5]
In reviewing these photographs and slides, we are guided by the following principles:
"`Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted *77 into evidence.... Finally photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.'"
Gaddy v. State, 698 So.2d 1100, 1148 (Ala. Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997) (quoting Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990)).
"`[P]hotographs depicting the character and location of wounds on a deceased's body are admissible even though they are cumulative and are based on undisputed matters. Magwood [v. State], 494 So.2d [124, 141 (Ala.Cr.App.1985), affirmed, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986)]. The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Id. Also, a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury. Id.'
"Ex parte Bankhead, 585 So.2d 112 (Ala. 1991). Accord, Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); McElroy's at § 207.01(2)."
Parker v. State, 587 So.2d 1072, 1092-93 (Ala.Cr.App.1991), opinion extended after remand, 610 So.2d 1171 (Ala.Cr.App.), aff'd, 610 So.2d 1181 (Ala.1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993). Photographs that depict the crime scene are relevant and therefore admissible. Aultman v. State, 621 So.2d 353 (Ala.Cr.App.1992), cert. denied, 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993); Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Finally,
"`"photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See generally C. Gamble, McElroy's Alabama Evidence, § 207.01(2) (4th ed.1991). "The photographs of the victim were properly admitted into evidence. Photographic exhibits are admissible even though they may be cumulative, ... demonstrative of undisputed facts, ... or gruesome...." Williams v. State, 506 So.2d 368, 371 (Ala.Cr.App.1986), cert. denied, 506 So.2d 372 (Ala.1987).'

"DeBruce v. State, 651 So.2d 599, 607 (Ala.Cr.App.1993). See also Ex parte Bankhead, 585 So.2d 112 (Ala.1991). The court did not err in allowing photographs of the victim's body to be received into evidence."
Hutcherson, 677 So.2d at 1200. See also Giles v. State, 632 So.2d 568 (Ala.Cr.App. 1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
In this case, the autopsy slides to which the appellant refers do not give any indication that the autopsy examination had been performed yet on the victims. Furthermore, contrary to the appellant's representation in brief, the State did not introduce slides that showed one victim after the pathologist "`opened the head'" of the victim. (Appellant's brief at p. 146.) Rather, one slide shows that Stacy Terry had been intubated by rescue workers who had attempted to revive him when they found his body. Nonetheless, this photograph is neither unnecessarily gruesome nor gory. Finally, the slides were relevant because they showed the location and severity of the victims' wounds. Therefore, the appellant's claim is without merit.
*78 We have reviewed the remaining photographs that were introduced at trial, and we do not find that they were unduly prejudicial to the appellant. Many reflect the crime scene and locations where the victims' bodies were found, Terry's vehicle, the mobile home where the appellant lived, and the motel room where the appellant resided before he was arrested. The appellant has not shown that the admission of any of the photographs affected or probably affected one of his substantial rights. Accordingly, the trial court did not err in admitting the photographs into evidence.

XXX.
The appellant's thirtieth argument is that the trial court invaded the province of the jury during its penalty-phase oral charge when it instructed the jury that it had to find as an aggravating circumstance that the murder was committed during the course of a robbery. He specifically refers to the following instruction:
"By the law of this State, the trial judge cannot comment on the evidence in the case; and I will not comment on the evidence in this case. However, by returning a verdict of guilty to count two of the indictment for the murder of Stacy Terry during a robbery of the 1995 Camaro, you, the jury, have already found the State has satisfied its burden of proof beyond a reasonable doubt as to the aggravating circumstance at issue in this phase of this trial. Therefore, it would be inconsistent with your previous finding that the aggravating circumstance that the capital offense was committed while the defendant was engaged in the commission of a robbery has not been proven beyond a reasonable doubt."
(R. 3331.) The appellant specifically argues that the instruction constituted an impermissible comment on the evidence and that it relieved the State of its burden of proving that aggravating circumstance.[6]
Initially, we note that the appellant did not raise these claims in the trial court. When the trial judge read his proposed charge to the prosecutor and defense counsel and asked that they tell him if they thought the instruction might be construed as a comment on the evidence, defense counsel objected only on the ground that the statute allowed for "double-counting," stating:
"[Defense counsel]: We would like to object because I understand the capital cases I've read when the defendant objects and argues his prejudice as to any point, the case is given even a tighter review of any given point. We don't want it to appear that we are waiving that objection.
"The Court: As to the double counting?
"[Defense counsel]: As to the double counting, yes, sir, but that is consistent with 13A-5-50 as worded and we do not think that it's an impermissible comment on the evidence."
(R. 3232-33.) Thus, the appellant's argument on appeal is inconsistent with his position at trial when the trial court specifically raised this issue. Furthermore, even after the trial court gave this instruction, defense counsel did not object on the grounds now raised on appeal. Therefore, because the appellant did not properly present this claim to the trial court, we review it for plain error. Rule 45A, Ala. R.App. P.
We addressed and rejected a claim similar to the appellant's in Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993), holding:
"Appellant contends that the trial court incorrectly instructed the jury, in *79 the sentencing phase of the trial, that it was to consider, as proven beyond a reasonable doubt by virtue of its guilty verdict, the aggravating circumstance under § 13A-5-49(6): that the capital offense of murder for hire, for which she had been found guilty, was committed for pecuniary gain....
". . . .
"Appellant's argument completely ignores that our capital murder statute contemplates that certain aggravating circumstances will be established by certain capital verdicts. This practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as `doublecounting' or `overlap.' This practice has been upheld. See Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (upholding Louisiana's capital offense statute in which the intent to kill more than one person is both an element of the capital offense and an aggravating circumstance); Ritter v. Thigpen, 828 F.2d 662 (11th Cir.1987) (double-counting or overlap does not rise to a constitutional level); Ex parte Ford, 515 So.2d 48 (Ala.1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988) (allowing the jury and trial court, in capital case, to find, as an aggravating circumstance for sentencing purposes, the same aggravation alleged in the indictment is not unconstitutional); Lawhorn v. State, 581 So.2d 1159 (Ala.Cr. App.1990) (the finding and consideration of a relevant aggravating circumstance is not precluded by its inclusion in the definition of the capital offense charged); Kuenzel v. State, 577 So.2d 474 (Ala.Cr. App.1990), aff'd, 577 So.2d 531 (Ala.1991) (overlap is constitutionally permissible).
"`The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.'

"Lowenfield v. Phelps, 484 U.S. at 244-45, 108 S.Ct. at 554.
"Our statutes that allow double-counting recognize that the jury, by its guilty verdict, finds the aggravating circumstance encompassed in the indictment to exist beyond a reasonable doubt.
"Section 13A-5-45(e) provides, as follows:
"`At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstances which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing.'
"Section 13A-5-50 provides, as follows:
"`The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.
"`By way of illustration and not limitation, the aggravating circumstance specified in section 13A-5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of section 13A-5-40.'
"Accordingly, we conclude that the aggravating circumstance that `[t]he capital offense was committed for pecuniary gain' was established, as a matter of law, by appellant's conviction of the capital crime of murder for hire, and the trial court correctly so charged the jury." *80 603 So.2d at 378-80. Thus, the trial court correctly instructed the jury on this issue, and the appellant's claim is without merit.

XXXI.
The appellant's thirty-first argument is that the manner of execution inflicted by the State of Alabama constitutes cruel and unusual punishment. However, numerous cases have held that the death penalty is not per se cruel and unusual punishment and that electrocution is not a cruel and unusual method of capital punishment. Williams v. State, 627 So.2d 985 (Ala.Cr. App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), rev'd on other grounds, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

XXXII.
The appellant's thirty-second argument is that the Alabama statute limiting court-appointed attorneys' fees to one thousand dollars for out-of-court work for each phase of a capital trial violates state and federal constitutional law. Specifically, he contends that the limitation violates the separation of powers doctrine, constitutes a taking without just compensation, and denies equal protection in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama state law. These claims have previously been addressed and decided adversely to the appellant. Ex parte Smith, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997); Boyd v. State, 715 So.2d 825 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998); Slaton v. State, 680 So.2d 879 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997); May v. State, 672 So.2d 1310 (Ala.1995); Barbour v. State, 673 So.2d 461 (Ala.Cr.App.1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996); Johnson v. State, 620 So.2d 679 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993); Smith v. State, 581 So.2d 497 (Ala.Cr.App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Sparks v. Parker, 368 So.2d 528 (Ala.1979), appeal dismissed, 444 U.S. 803, 100 S.Ct. 22, 62 L.Ed.2d 16 (1979).

XXXIII.
The appellant's thirty-third argument is that the cumulative effect of the abovealleged claims of error entitles him to a new trial and a new sentence determination. Our review of the record does not reveal any errors that were prejudicial to the appellant. Accordingly, the appellant's argument is without merit.

XXXIV.
Pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of the appellant's convictions and sentences of death. The appellant was indicted and convicted of capital murder because he committed two murders by one act or pursuant to one scheme or course of conduct, § 13A-5-40(a)(10), Ala.Code 1975, and because he committed one of the murders during the course of a robbery, § 13A-5-40(a)(2), Ala.Code 1975.
The record does not reflect that the sentences of death were imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. § 13A-5-53(b)(1), Ala.Code 1975.
The trial court found that the aggravating circumstances outweighed the *81 mitigating circumstances. The trial court found that the State proved only one aggravating circumstanceâ the appellant committed the capital offense while he was engaged in the commission of a robbery, § 13A-5-49(4), Ala.Code 1975. The trial court found that there was one statutory mitigating circumstanceâ the appellant had no significant history of prior criminal activity, § 13A-5-51(1), Ala.Code 1975. The trial court also made the findings set forth in Part VI of this opinion concerning non-statutory mitigating circumstances. The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced the appellant to death. Its decision is supported by the record, and we agree with its findings.
Section 13A-5-53(b)(2) requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's sentences of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentences are appropriate.
As required by § 13A-5-53(b)(3), we must determine whether the appellant's sentences were disproportionate or excessive when compared to the penalties imposed in similar cases. The appellant murdered two friends pursuant to one scheme or course of conduct and during a robbery. Similar crimes are being punished by death throughout this state. Gaddy v. State, 698 So.2d 1100 (Ala.Cr. App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997); Bush v. State, 695 So.2d 70 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997); Payne v. State, 683 So.2d 440 (Ala.Cr.App.1995), aff'd, 683 So.2d 458 (Ala.1996), cert. denied, 520 U.S. 1146, 117 S.Ct. 1319, 137 L.Ed.2d 481 (1997); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997); Taylor v. State, 666 So.2d 36 (Ala. Cr.App.), opinion extended after remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); Holladay v. State, 549 So.2d 122 (Ala.Cr.App.1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989); Siebert v. State, 555 So.2d 772 (Ala.Cr.App.), aff'd, 555 So.2d 780 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); Peoples v. State, 510 So.2d 554 (Ala.Cr.App.1986), aff'd, 510 So.2d 574 (Ala.), cert. denied, 484 U.S. 933, 108 S.Ct. 307, 98 L.Ed.2d 266 (1987). Thus, we find that the sentences were neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected the appellant's substantial rights, and we have found none. Rule 45A, Ala. R.App. P.
Accordingly, we affirm the appellant's convictions and sentences of death by electrocution.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, and FRY, JJ., concur.
NOTES
[1] For a detailed description of the T-shirt, see Part VIII of this opinion.
[2] For a discussion of the appellant's argument that the trial court improperly denied him discovery of DNA-related evidence, see Part I of this opinion.
[3] We note that, effective October 1, 1998, the Alabama Supreme Court adopted, as Form 111 to the Alabama Rules of Criminal Procedure, a Recommended Juror Questionnaire. However, the use of the questionnaire is not mandatory.
[4] The appellant argues that this court cannot fully review this issue because all of the photographs were not included in the record on appeal. However, we have obtained, from the Morgan County Circuit Clerk's office, the photographs and slides introduced in this case. Therefore, this claim is moot.
[5] The appellant does make one allegation that some of the photographs revealed unrelated prior offenses. We discussed those photographs in Part XVIII of this opinion Therefore, we will not revisit that issue here.
[6] The appellant argues that the instruction improperly resulted in "double counting." Because we have already addressed the propriety of "double counting" in Part XXV of this opinion, we will not further discuss it here.